**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. [FILED UNDER SEAL], | CASE NO. |
| Plaintiffs, | **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT** |
| v. | |
| [FILED UNDER SEAL], | **DEMAND FOR JURY TRIAL** |
| Defendants. | |
| | **[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]** |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. RESOLUTE 3 LLC, <br><br>         Plaintiffs, <br><br>      v. <br><br> LABQ CLINICAL DIAGNOSTICS, LLC; COMMUNITY MOBILE TESTING INC; MOSHE LANDAU; DANIEL ADAR; JACOB WEISS; and DOES 1-10. <br><br>         Defendants. | CASE NO. <br><br> **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]** |

### TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE .................................................................... 3

III.    PARTIES ......................................................................................................... 3

IV.     STATUTORY BACKGROUND .................................................................. 4

    A.      The False Claims Act ...................................................................... 4

    B.      The Anti-Kickback Statute ............................................................. 5

    C.      HRSA Program ............................................................................... 6

V.      DEFENDANTS KNOWINGLY VIOLATED THE FEDERAL FALSE CLAIMS ACT........................................................................................................ 8

    A.      The LABQ Collection and Testing Process..................................... 9

    B.      DEFENDANTS avoid collecting patient insurance information and bill HRSA even if patients have insurance. ........................................ 11

    C.      LABQ contracts to provide surveillance testing to privately insured nursing home employees, yet bills these tests to HRSA.................... 15

    D.      LABQ bills HRSA for rapid testing even when rapid testing was not performed. ........................................................................................ 17

    E.      LABQ illegally bills all patients insured with the NY Medicaid program to HRSA. .......................................................................... 19

    F.      LABQ turns mistakes into an opportunity for fraud. ...................... 19

    G.      LABQ and LANDAU shunned the LABQ Co-CEO when he advocated for an audit of LABQ's billing practices. ........................................ 20

    H.      All levels of management know that "rampant corruption" is occurring. ........... 21

    I.      Defendants rake in money from false billings. ................................ 22

VI.     CAUSES OF ACTION .................................................................................. 24

    FIRST CAUSE OF ACTION
    On Behalf of the United States Federal False Claims Act, Presenting False Claims 31 U.S.C. § 3729(a)(1)(A)
    (Against All Defendants) ....................................................................... 24

    SECOND CAUSE OF ACTION
    On Behalf of the United States Federal False Claims Act, Making or Using False Records Material to a False Claim 31 U.S.C. § 3729(a)(1)(B)
    (Against All Defendants) ....................................................................... 25

VII.    PRAYER FOR RELIEF ............................................................................... 26

VIII.   DEMAND FOR JURY TRIAL ................................................................... 29

i

Plaintiffs UNITED STATES OF AMERICA ("United States"), by and through Relator

RESOLUTE 3 LLC ("RELATOR" or "RESOLUTE 3"), allege as follows:

I.    **INTRODUCTION**

1.      LABQ CLINICAL DIAGNOSTICS, LLC ("LABQ"), and LABQ's Chief

Executive Officer MOSHE LANDAU, LABQ's Chief Operating Officer DANIEL ADAR,

COMMUNITY MOBILE TESTING INC, a company controlled by LABQ and LANDAU, and

JACOB WEISS, Executive Director of COMMUNITY MOBILE TESTING INC, and DOES 1-

10 (collectively, "DEFENDANTS"), are perpetrating a fraud on U.S. taxpayers through a

scheme designed to defraud the federal government Health Resources and Services

Administration ("HRSA"), an agency of the U.S. Department of Health and Human Services.

2.      In an effort to combat the devastating health and economic consequences of

coronavirus disease 2019 ("COVID-19"), the federal government of the United States has

created a program to provide free testing for COVID-19 to uninsured persons living in the

United States.  This program (the "Uninsured Program") is administered by HRSA.

3.      In order to participate in the Uninsured Program, medical providers must first

attempt to solicit information about whether or not a patient is insured.  If a patient is uninsured,

the medical provider may bill HRSA for reimbursement.

4.      HRSA reimburses medical providers for COVID-19 testing in a highly lucrative

manner for medical providers as the payments are readily approved. This stands in stark contrast

to how private or government insurance payor process claims. They often delay, request

additional information, or deny payments entirely on claims.

5.      DEFENDANTS participate in HRSA's programs.  However, DEFENDANTS

violate HRSA requirements by failing to ask patients for their insurance information, failing to

use alternate standard procedures for verifying patient insurance eligibility, and simply billing HRSA for reimbursement.

6.      An enormous number of DEFENDANTS' patients do, in fact, have insurance, and HRSA should not have been billed for the services rendered to test for COVID-19.

7.      By failing to ask patients for insurance or verify patient insurance eligibility, but certifying that to the best of their knowledge, the patients are uninsured, DEFENDANTS have made false claims for payment to the federal government.

8.      Moreover, DEFENDANTS routinely falsely bill HRSA for "rapid" testing, even though DEFENDANTS fail to turn around test results within the required two calendar days, which results in false claims for payment.

9.      In addition, DEFENDANTS have violated the federal Anti-Kickback Statute by providing surveillance testing to certain nursing homes at no cost in exchange for the referral of business.  These tests are charged to HRSA, despite the fact that the nursing home provides private insurance to their employees, rendering the nursing home employees ineligible for participation in HRSA's Uninsured Program.

10.      These schemes have proven highly lucrative to DEFENDANTS.  LABQ's revenue exploded from about $15 million a quarter in 2020 to approximately $175 million per quarter for each of the last three quarters in 2021, as confirmed by DEFENDANT LANDAU to two members of RELATOR and to Aaron Domenico, owner of Atlantic Diagnostic Laboratories, LLC, in October or early November 2021.  Domenico said, "If ever there was a whistleblower case, this is it."

11.      This is a *qui tam* action for violation of the federal False Claims Act (31 U.S.C. §§ 3150 et seq.) to recover treble damages, civil penalties and attorneys' fees and costs for

Plaintiffs and on behalf of the United States for fraudulent claims submitted to HRSA, and for failure to reimburse HRSA.

12.     Non-public information personally known to Relator Resolute 3 LLC serves as the basis for this action.

## II.   <u>JURISDICTION AND VENUE</u>

13.     This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the federal False Claims Act and authorize nationwide service of process.  Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as all DEFENDANTS heavily transact business in the Southern District of New York, and LABQ conducts much of its operations in the Southern District of New York.

## III.   <u>PARTIES</u>

14.     The plaintiff in this action is the UNITED STATES OF AMERICA by and through Relator RESOLUTE 3 LLC.

15.     RELATOR RESOLUTE 3 LLC is a Delaware limited liability company, whose members have long been involved in the healthcare industry.

16.     DEFENDANT LABQ CLINICAL DIAGNOSTICS, LLC is a New York limited liability company.

17.     DEFENDANT MOSHE LANDAU is the Chief Executive Officer of LABQ.

18.     DEFENDANT DANIEL ADAR is the Chief Operating Officer of LABQ.

19.     DEFENDANT COMMUNITY MOBILE TESTING INC is a New York corporation controlled by LABQ and LANDAU.

20.     DEFENDANT JACOB WEISS is the Executive Director of COMMUNITY MOBILE TESTING INC.

3

21.     The true names and capacities of Defendants DOES 1–10, inclusive, are currently

unknown to RELATOR.  Each DOE Defendant, individually and collectively, is responsible in

some manner for the unlawful acts alleged herein. RELATOR will seek leave of this Court to

amend this Complaint to reflect the true names and capacities of the DOE Defendants when their

identities become known.

## IV.     STATUTORY BACKGROUND

### A.     The False Claims Act

22.     The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement

and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009),

provides, in pertinent part, that a person is liable to the United States government for three times

the amount of damages the government sustains because of the act of that person, plus civil

penalties, for each instance in which the person "knowingly presents, or causes to be presented, a

false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(1)(1)(A).

23.     The FCA defines the term "claim" to mean "any request or demand, whether

under a contract or otherwise, for money or property and whether or not the United States has

title to the money or property, that (i) is presented to an officer, employee, or agent of the United

States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be

drawn down or used on the Government's behalf or to advance a Government program or

interest, and if the United States Government (i) provides or has provided any portion of the

money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or

other recipient for any portion of the money or property which is requested or demanded."  *Id.*

§ 3729(b)(2)(A).

24.     As amended by FERA, the FCA also makes a person liable to the United States

government for three times the amount of damages which the government sustains because of the

4

act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" (*id.* § 3729(a)(1)(B)), or for each instance in which the person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(1)(1)(G).

25.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (i) "has actual knowledge of the information"; (ii) "acts in deliberate ignorance of the truth or falsity of the information"; or (iii) "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A)(i)-(iii). The FCA further provides that "no proof of specific intent to defraud" is required. *Id.* § 3729(b)(1)(B).

### B.     The Anti-Kickback Statute

26.     The federal Anti-Kickback Statute ("AKS") (*see* 42 U.S.C. § 1320a-7b) is a criminal statute that prohibits the exchange (or offer to exchange), of anything of value, in an effort to induce (or reward) the referral of business reimbursable by a federal health care program.

27.     The Affordable Care Act, passed in March 2010, made explicit that violations of the AKS give rise to False Claims Act liability: "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." *Id.* § 1320a-7b(g).

28.     Specifically, the AKS creates liability for "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health care program . . . ." *Id.* § 1320a-7b(b)(2)(A).

29.     The term "federal health care program" is defined as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government." *Id.* § 1320a-7b(f).

30.     HRSA is a federal health care program for purposes of the AKS, as more fully described below.  Any attempt to induce an individual to furnish an item or service for reimbursement from HRSA would be a violation of the AKS, which is a *per se* violation of the FCA.

**C.     HRSA Program**

31.     HRSA is an agency of the U.S. Department of Health and Human Services. HRSA programs provide equitable health care to people who are geographically isolated and economically or medically vulnerable.  The federal government constructed a program, run by HRSA, to provide free COVID-19 testing to **uninsured** individuals.

32.     HRSA supports health care providers fighting the COVID-19 pandemic through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (the "Uninsured Program").

33.     Funding for the Uninsured Program comes from the following federal sources:

   a. The Families First Coronavirus Response Act or FFCRA (P.L. 116-127) and the Paycheck Protection Program and Health Care Enhancement Act or PPPHCEA (P.L. 116-139), which each appropriated $1 billion to reimburse providers for conducting COVID-19 testing for uninsured individuals.
   b. The Coronavirus Aid, Relief, and Economic Security (CARES) Act (P.L. 116-136), which provided $100 billion in relief funds, including to hospitals and other health care providers on the front lines of the COVID-19 response; the Paycheck Protection Program and Health Care Enhancement Act or PPPHCEA (P.L. 116-139), which appropriated an additional $75 billion in relief funds; and the Coronavirus Response and

Relief Supplemental Appropriations Act (CRRSA) (P.L. 116-260), which appropriated an additional $3 billion (collectively, the Provider Relief Fund). Within the Provider Relief Fund, a portion of the funding supports health care-related expenses attributable to COVID-19 testing for the uninsured and treatment of uninsured individuals with COVID-19. A portion of the funding is also used to reimburse providers for administering Food and Drug Administration-authorized or licensed COVID-19 vaccines to uninsured individuals.

c. The American Rescue Plan Act of 2021 (ARPA, P.L. 117-2), which allocated funding to reimburse providers for COVID-19 testing of the uninsured.

34.    Under the Uninsured Program, HRSA reimburses expenses associated with COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, for uninsured patients.  A patient is considered uninsured if the patient did not have <u>any</u> health care coverage at the time services were rendered, whether that insurance derives from private or public markets.[1]

35.    Given that HRSA's Uninsured Program provides health benefits by reimbursing the cost of COVID-19 testing and administration, and those benefits are funded directly, in whole or in part, by the United States Government, HRSA's Uninsured Program operates as a federal health care program for the purposes of the AKS and FCA.

36.    A medical provider applying for reimbursement from the Uninsured Program must agree to HRSA's Terms and Conditions, attached hereto as **EXHIBIT A**.  The applicant must certify that "to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided."  *See* **EXHIBIT A** at p. 3.

---

[1] HRSA, "FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration," available at https://www.hrsa.gov/coviduninsuredclaim/frequently-asked-questions.  *See also* The Families First Coronavirus Response Act or FFCRA (P.L. 116-127) ("The term 'uninsured individual' in this paragraph means an individual who is not enrolled in—(1) a Federal health care program . . . or (2) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market."); Paycheck Protection Program and Health Care Enhancement Act or PPPHCEA (P.L. 116-139) ("[U]p to $1,000,000,000 of funds provided under this paragraph in this Act may be used to cover the cost of testing for the uninsured, using the definitions applicable to funds provided under this heading in Public Law 116–127.")

37.     HRSA reimburses at rates pegged to Medicare.[2]  Medicare reimburses up to $125 per COVID-19 test: $75 for the base test (CPT 87635), $25 for expedited service (HCPCS code U0005), and $25 for specimen collection (HCPCS code C9803; or HCPCS G2023; or HCPCS code G2024).[3]  HRSA requires two claims for full reimbursement—one claim to cover the base test and expedited service, if applicable, and a second claim for specimen collection.

## V.     DEFENDANTS KNOWINGLY VIOLATED THE FEDERAL FALSE CLAIMS ACT

38.     LABQ collects patient specimens for COVID-19 testing at a range of facilities in New York and New Jersey, including mobile vans, temporary street stands, pharmacies, municipal sites and nursing homes.  COMMUNITY MOBILE TESTING INC carries out the operations at mobile vans used as specimen collection sites.

39.     The majority of LABQ's patients are walkups to their mobile sites, which line the streets of New York and New Jersey.

40.     As with all clinical labs, a tremendous number of LABQ's patients have health insurance.  The US Census Bureau reported in 2020 that only 8.6% of people in America did not have health insurance at any point during the year, and that the percentage of people with health insurance for all or part of 2020 was 91.4 %.[4]

/ /

/ /

/ /

---

[2] HRSA, "FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration," available at https://www.hrsa.gov/coviduninsuredclaim/frequently-asked-questions.
[3] CMS Rulings dated January 1, 2021, available at https://www.cms.gov/files/document/cms-ruling-2020-1-r2.pdf; see also CMS.gov, "CMS Changes Medicare Payment to Support Faster COVID-19 Diagnostic Testing" dated Oct 15, 2021, available at https://www.cms.gov/newsroom/press-releases/cms-changes-medicare-payment-support-faster-covid-19-diagnostic-testing.
[4] United States Census Bureau, "Health Insurance Coverage in the United States: 2020," available at https://bit.ly/32vcjP4.

**A.** **The LABQ Collection and Testing Process**

41.      Any patient seeking testing can walk up to a LABQ mobile testing site.  The mobile testing sites are owned by LABQ, branded as LABQ, and operated by COMMUNITY MOBILE TESTING INC.

42.      COMMUNITY MOBILE TESTING INC personnel operate the LABQ mobile testing sites and act under the direction of DEFENDANTS WEISS.

43.      WEISS and COMMUNITY MOBILE TESTING INC each act at the direction of DEFENDANT LANDAU and LABQ.  A former officer of LABQ (the "LABQ Co-CEO") observed that LANDAU gave instructions to WEISS regarding COMMUNITY MOBILE TESTING INC's operations and business strategy.

44.      A patient "checks in" to a LABQ mobile site by arriving at a testing location and scanning a QR code on their cell phone. A copy of the QR code is attached hereto as **EXHIBIT B**.

45.      The QR code directs the patient to a landing page that asks for only two pieces of data—the patient's phone number and date of birth.  A copy of the landing page is attached hereto as **EXHIBIT C**.

46.      After the patient inputs that information, the patient is directed to a lengthier intake page that with sections for additional information, including, among other things, name, address, and insurance information. At the top of the insurance information section is a box to check with words in bold that say, "**I don't have Insurance**."  A screenshot of the lengthier intake page appears below, with the bolded language highlighted, and is attached hereto as **EXHIBIT D**.



47.      Alternately, the personnel at the mobile testing site provide patients with a

COVID-19 requisition form, attached hereto as **EXHIBIT E**.  Although there is a space to input

insurance information, employees routinely do not ask for this information, nor is insurance

information required for the form to be considered complete, as discussed more fully below.  A

LABQ or COMMUNITY MOBILE TESING INC employee completes the form, which will

eventually be submitted to HRSA for reimbursement.

48.     At the testing site, a LABQ or COMMUNITY MOBILE TESING INC technician collects a nasal swab from a patient.  The sample is then transported to one of LABQ's labs in New York or New Jersey.  COMMUNITY MOBILE TESING INC or a courier transports samples collected from their mobile vans back to LABQ for testing.

49.     LABQ performs a polymerase chain reaction ("PCR") test on the specimen.  A PCR test is a molecular test that analyzes one's "upper respiratory specimen, looking for genetic material (ribonucleic acid or RNA) of SARS-CoV-2, the virus that causes COVID-19."[5]

**B.      DEFENDANTS avoid collecting patient insurance information and bill HRSA even if patients have insurance.**

50.     HRSA regulations require an entity submitting claims to HRSA to certify that "to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals."[6]

51.     LABQ and COMMUNITY MOBILE TESTING INC routinely avoid asking about insurance information or refuse to accept it even when offered.  LABQ and COMMUNITY MOBILE TESTING INC do not require inputting insurance information on intake forms.  If patients volunteer that they have insurance, they are told the insurance information is not necessary.  Patients are often instructed by LABQ or COMMUNITY MOBILE TESTING INC personnel to falsely indicate on LABQ or COMMUNITY MOBILE TESTING INC's registration form that they do not have insurance.

52.     Several witnesses attested at LABQ/ COMMUNITY MOBILE TESTING INC mobile sites that they had insurance and were essentially told "not to bother" inputting it.

---

[5] Cleveland Clinic, "COVID-19 and PCR Testing," available at
https://my.clevelandclinic.org/health/diagnostics/21462-covid-19-and-pcr-testing.
[6] HRSA, "Terms and Conditions for Participation in the HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program," available at https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/uninsured-program-terms-and-conditions-6-21.pdf.

53.     For example, one witness with private insurance visited a mobile site located in the Meatpacking District in New York City for a COVID-19 test in August 2021. Her statement is as follows:

> "I was told to go to this location by my office because my co-workers let me know it wasn't through insurance and free of charge. When I reached the front of the line, the technician handed me an iPad to register and complete the demographic information requested. It asked for my name, phone number and email contact only. I then asked about insurance information because I didn't want to receive a bill from the lab. He confirmed that would not be necessary and to only answer the general questions listed. After filling out the information, he said I could receive a rapid test on site and a PCR test at no charge. For the rapid test, the results were available in about 15 minutes and for the PCR I would hear back within 48 hours - all results sent via text. Following the tests, I would periodically log on to my medical insurance portal and check for any processed claim from LABQ testing services. A claim was never submitted to my insurance."

54.     Another witness, DG1, went to a mobile testing site in mid-December. While standing in line for testing, DG1 "overheard the woman behind me remark to the LABQ staff member that although she had insurance, she did not have her insurance card with her. Without hesitation, the staff member instructed her to click the 'I do not have insurance' option' [on the mobile requisition form]. After clicking that she did not have insurance, she was able to get tested for COVID-19."

55.     A member of RELATOR had a personal conversation with another Witness DG2 (a veteran in the clinical lab industry with over 30+ years working for several lab companies). DG2's son, a full-time employee with medical benefits, visited a LABQ site and was advised to indicate that he had no insurance, despite the fact that he did have insurance, and he was prepared to provide his insurance card. The reply from the LABQ technician was, "Don't worry about it."

56.     A member of RELATOR, who is privately insured, also personally visited a LABQ mobile testing site on January 25, 2022. He asked a technician how the registration

process worked, and she handed him a business card with a QR code in the front. A screenshot of the QR code is attached as **EXHIBIT B**. He told her he had medical insurance, but not with him. She said, "That's no problem, all testing is free of charge, and you don't need to provide proof of insurance." At that point, she was getting ready to leave and was unable to provide a test, so he asked if he could stop by the next day. She replied that he could go to any mobile site as they all follow the same protocols.

57.     LABQ knows that its employees fail to collect insurance information. DEFENDANT ADAR, LABQ's COO, and Esther Wurzberger, LABQ's Billing Manager, both confirmed to the LABQ Co-CEO that insurance information is rarely asked of patients at the mobile vans.  One stated reason was that the employees are "too busy."  Long lines of patients wanting COVID-19 testing are often stretched down the block from the mobile vans.

58.     Being "too busy" is not a valid justification for failing to collect insurance information. If a company is "too busy," loses paperwork, forgets, or otherwise fails to collect insurance information, standard industry practice requires verifying patient insurance eligibility through a third-party portal, such as TevixMD or FrontRunnerHC.  These third parties use available patient information, such as name, date of birth or contact information, to ascertain whether a patient has insurance.

59.     Attached as **EXHIBIT F** is a picture of a LABQ line reaching down the block. Attached as **EXHIBIT G** is a picture of a competitor 100 yards away from the LABQ line with a single patient.  One witness told a member of RELATOR that LABQ's lines are always long because LABQ does not collect insurance information.

60.     Claims of patients with insurance are fraudulently billed to HRSA.

61.     Below is a screenshot of LABQ's billing information for a "Witness Jane," also attached in larger format as **EXHIBIT H**.  Witness Jane has private insurance through Aetna, but the claim was billed to HRSA, as shown in column 3 of the billing data.  HRSA reimbursed $100 on the claim, as shown in column 9 of the billing data. HRSA reimburses claims for a base test and expedited service jointly but requires a separate claim for specimen collection. Given that LABQ enters one line for every claim reimbursement, this entry means that HRSA reimbursed LABQ for this witness's base test and expedited service.



62.     DEFENDANTS knew or should have known that Witness Jane had private insurance.  They could have asked her.  They did not.

63.     If DEFENDANTS failed to collect her insurance information, they could have found out Witness Jane had insurance information anyway by using TevixMD, FrontRunnerHC, or another third-party provider to verify her insurance information.  They did not.

64.     Determining front-end insurance eligibility is standard practice in the laboratory industry in order to avoid costly claim denials. "Clean" claims are aways a laboratory's primary objective. LABQ neither asks for insurance nor sends in clean claims.

65.     Attached as **EXHIBIT I** is a LABQ test report for Patient John. It says that Patient John's sample was collected on December 17, 2021, and that his test results were reported on December 21, 2021.  Patient John's specimen was actually collected December 16, 2021.  During his intake, Patient John provided LABQ with his private insurance information from Independence Blue Cross.

66.     Attached as **EXHIBIT J** is Patient John's private insurance claims information portal from Independence Blue Cross, which queries all claims submitted to his private insurance from October 24, 2021 to January 24, 2022.  A claim for payment on his test has never been submitted to Independence Blue Cross.  The claim for payment on Patient John's test was submitted to HRSA.

**C.     LABQ contracts to provide surveillance testing to privately insured nursing home employees, yet bills these tests to HRSA.**

67.     On May 10, 2020, then Governor Andrew M. Cuomo signed Executive Order 202.30, to require all nursing homes to test personnel for COVID-19 in conformity with guidelines issued by the Commissioner on Health.[7]

68.     From approximately May 2020 to July 2021, LABQ received specimens from nursing homes and tested their personnel for COVID-19 twice per week.  These nursing home employees had private insurance information, which LABQ failed to collect, or collected and ignored.  Instead, LABQ billed all nursing home claims to HRSA.

69.     In providing testing services to nursing homes, LABQ effectuated a cunning kickback scheme, in violation of the AKS and FCA.  At the time, mandatory reimbursement for

---

[7] Executive Order of Governor Andrew Cuomo, No. 202.30, available at https://www.governor.ny.gov/sites/default/files/atoms/files/EO202.30.pdf.

COVID-19 testing did not cover surveillance testing.[8]  The nursing homes' owner, DEFENDANT LANDAU's brother, did not want to incur the cost of weekly testing, so he engaged LANDAU to provide surveillance testing and bill the tests to HRSA.  In exchange for his brother's referral of government-payor business, LANDAU's brother got free testing for his nursing homes, and LABQ got increased HRSA revenue.

70.     This is "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program" in violation of the AKS, which is a per se violation of the FCA. 42 U.S.C. § 1320a-7b.

71.     The LABQ Co-CEO was told by DEFENDANT LANDAU, CEO of LABQ, that the arrangement with the nursing homes is that "they will never be billed (the nursing homes) for Covid tests and there will be zero cost to anyone." LANDAU knew about and directed the kickback scheme.

72.     There were alternate, cost-effective means of providing surveillance testing for nursing home employees.  One of the members of RELATOR operated another New York based Clinical Laboratory, ENZO Biochem, Inc. ("ENZO"), which provided testing to nursing homes.

---

[8] A June 2020 bulletin prepared jointly by the Department of Labor (DOL), the Department of Health and Human Services (HHS), and the Department of the Treasury, made it this clear that private insurers were not required to reimburse for surveillance testing.  See https://www.cms.gov/files/document/FFCRA-Part-43-FAQs.pdf. Relevant text is as follows:

> "Is COVID-19 testing for surveillance or employment purposes required to be covered under section 6001 of the FFCRA?  No. Section 6001 of the FFCRA requires coverage of items and services only for diagnostic purposes as outlined in this guidance…However, testing conducted to screen for general workplace health and safety (such as employee "return to work" programs), for public health surveillance for SARS-CoV-2, or for any other purpose not primarily intended for individualized diagnosis or treatment of COVID-19 or another health condition is beyond the scope of section 6001 of the FFCRA."

The nursing homes negotiated a reasonable fee with a contracted service provider, which in turn utilized ENZO's services.

73.     One nursing home involved in this scheme is Hempstead Park, located at 800 Front St, Hempstead, NY 11550.

74.     Hempstead Park offers private insurance to its employees through Union 1199's insurance plan. The personnel and billing records from Hempstead Park, and other nursing homes that did business with DEFENDANTS, will show that the nursing home employees tested by LABQ had private insurance, but their claims were submitted to HRSA for reimbursement.

75.     **EXHIBIT H** contains the claim reimbursement information for one of the nursing home employees at Hempstead Park whose claim for reimbursement on COVID-19 testing was fraudulently submitted to HRSA.  The patient was privately insured by Aetna.[9]

76.     The LABQ Co-CEO estimates that the nursing home scheme resulted in $75,000 to $100,000 in additional revenue to LABQ every month for the duration of the scheme.

77.     Billing HRSA for surveillance testing for privately insured patients who work at nursing homes is improper.  HRSA's program is only to be used for uninsured individuals; any submission of a claim to HRSA for an insured individual is a false claim.

 **D.     LABQ bills HRSA for rapid testing even when rapid testing was not performed.**

78.     LABQ routinely billed HRSA for rapid testing, even when rapid testing was not performed.  As described, HRSA pays $25 for expedited service (HCPCS code U0005).

---

[9] This particular nursing home employee does not use the private insurance offered by her employer, but she does have private insurance.

79.     To qualify for rapid testing reimbursement, a laboratory must complete testing within "two calendar days of the specimen being collected."[10]

80.     LABQ's failure to report tests in a timely manner was so notorious that it attracted the attention of the New York Attorney General.  On December 20, 2021, the Office of the Attorney General sent LABQ a letter stating that the Office was aware of patients waiting over 96 hours for test results when LABQ advertised rapid testing and demanding that LABQ change its advertising to reflect true turnaround times.  *See* **EXHIBIT K**.  The New York Attorney General had no knowledge of the related problem that LABQ was improperly billing HRSA for rapid testing.

81.     LABQ changed its website to note that delays were possible due to high demand for testing services to pacify the New York Attorney General.  Yet even when LABQ failed to report rapid test results, LABQ continued to bill HRSA for rapid tests.

82.     When LABQ failed to deliver test results within two days, it would deliberately falsify records submitted to HRSA, lying that it had provided test results within two days.

83.     Attached as **EXHIBIT L** is a picture of a massive backlog of specimens awaiting testing at a LABQ testing site, taken in December 2021.  The LABQ Co-CEO had a conversation with LABQ Billing Supervisor John Terico regarding these specimens.  Mr. Terico told the LABQ Co-CEO that even though LABQ had a backlog of over <u>70,000 specimens</u> which did not qualify for rapid billing, HRSA would be billed for rapid testing on those specimens.

---

[10] CMS.gov, "CMS Changes Medicare Payment to Support Faster COVID-19 Diagnostic Testing" dated Oct 15, 2021, available at https://www.cms.gov/newsroom/press-releases/cms-changes-medicare-payment-support-faster-covid-19-diagnostic-testing.

**E.    LABQ illegally bills all patients insured with the NY Medicaid program to HRSA.**

84.    LABQ does not have a NY Medicaid license and legally cannot bill Medicaid for tests performed on Medicaid patients.[11]  However, rather than send these patients to a Medicaid licensed lab and lose a revenue opportunity,[12] Defendants falsely claim that Medicaid patients do not have insurance, and fraudulently bill HRSA for services rendered to Medicaid insurance patients.

85.    The LABQ Co-CEO estimates that this false billing amounts to approximately 30% of LABQ's COVID-19 revenue.

**F.    LABQ turns mistakes into an opportunity for fraud.**

86.    During the collection process, a sample may inadvertently be lost.  LABQ will run a test on a fake sample and bill the sample to HRSA.

87.    In October 2021, the LABQ Co-CEO personally witnessed the LABQ Manager for COMMUNITY MOBILE TESTING INC, "Eilona," instruct an employee to "re-accession" a sample—that is, with a lost sample, pull a patient specimen from storage that has already been tested and reported as negative, and re-test the specimen in place of the true, lost specimen, so that the specimen can be billed to HRSA. This egregious conduct may result in the reporting of false negative results, exposing anyone the patient comes into contact with to a contagious disease, and failing to alert a patient who is actually positive that he/she may need treatment.

/ /

/ /

---

[11] *See* 42 C.F.R. § 455.410.  See also LabQ's Accreditation & Licensing webpage, which does not list Medicaid as an available license, available at https://labq.com/about/accreditation-licensing.

[12] There are many Medicaid providers in the New York Metro area, including but not limited to: Affinity Health Plan, Inc.; Health Insurance Plan of Greater New York, Inc. (HIP); Healthfirst, Inc.; HealthPlus HP, LLC; MetroPlus Health Plan, Inc.; New York Quality Healthcare Corporation; UnitedHealthcare of New York, Inc.; and WellCare of New York, Inc.

**G.     LABQ and LANDAU shunned the LABQ Co-CEO when he advocated for an audit of LABQ's billing practices.**

88.     The LABQ Co-CEO joined LABQ in September 2021.

89.     By mid-October 2021, the LABQ Co-CEO learned of an audit request from Blue Cross Blue Shield ("BCBS").  BCBS requested that LABQ audit five patients' records to see if any had been improperly billed to HRSA.  Three of the five patients had been improperly billed. LABQ reimbursed HRSA for the billing on those three patients.

90.     The LABQ Co-CEO was alarmed and requested a wider audit of around 20,000 patients. Attached as **EXHIBIT M** is an email from the LABQ Co-CEO to DEFENDANT LANDAU, stating, "I took the liberty to call a friend of mine that owns a billing company in India.  They will take 20,000 patients that we billed to HRSA and look and see if they have or had insurance.  The above is a proposal."

91.     DEFENDANT LANDAU replied, "We should only send a new list for Dec to Feb, will explain you tomorrow the situation we have with the current billing company, thx"

92.     The LABQ Co-CEO initially felt hopeful that DEFENDANT LANDAU would engage in a wider audit, but it quickly became clear that LANDAU had no intention of doing so. The LABQ Co-CEO followed up dozens of times, often in person.  DEFENDANT LANDAU would avoid the conversation, saying, "Let's talk about this another time; I'm too busy." This shows that DEFENDANT LANDAU was well aware of a fraudulent billing scheme with HRSA but refused to take any corrective action.

93.     Shortly after raising the specter of a billing audit, the LABQ Co-CEO was locked out of access to billing and other database systems. He learned that employees were told they did not need to listen to him and to cover their computer screens when he walked by.  Powerless to act, the LABQ Co-CEO resigned rather than participate in these fraudulent billing practices.

**H.      All levels of management know that "rampant corruption" is occurring.**

94.      DEFENDANTS are aware that LABQ is filled with "rampant corruption."

95.      LABQ's Billing Manager, Esther Wurzberger spoke openly with the LABQ Co-CEO about improper HRSA billing.  She told the LABQ Co-CEO that she would be the first witness in a whistleblower lawsuit, because she personally witnessed improper billing to HRSA.

96.      LABQ's Chief Operating Officer, DEFENDANT ADAR, also confirmed that LABQ improperly billed Medicaid patients to HRSA.  In October 2021, ADAR told the LABQ Co-CEO that DEFENDANT LANDAU had been experiencing chest pains because the company might be investigated for improper billing.  Multiple times, in or around October 2021, the LABQ Co-CEO asked ADAR why LABQ was falsely billing HRSA, and ADAR dismissed his concerns, responding: "Don't worry about it—we'll get it corrected."  The LABQ Co-CEO observed that LABQ continued to falsely bill HRSA following this conversation with ADAR.  ADAR was knowingly complicit in the scheme.

97.      LABQ Billing Supervisor John Terico confirmed to the LABQ Co-CEO that it was LABQ's policy not to ask for patients' insurance information at van testing sites.

98.      LABQ's former IT Manager, Ben Fallon wrote the following in a resignation email of December 7, 2021, which the LABQ Co-CEO received by text message:

> "I regret to inform you that I am no longer able to fill the role of IT Director at LABQ Diagnostics.  It is, and has been for many months, apparent that the moral and ethical code of the company and its ownership does not meet my personally higher standards and I can no longer sit idly by and watch people who I care dearly and deeply about be abused and suffer due to the **rampant corruption** and unprofessionalism that I have experienced since April." He also cited the "**constant protection of toxic, corrupt or simply incompetent employees**."

99.      JACOB WEISS, Executive Director of COMMUNITY MOBILE TESTING INC, was responsible for training remote employees on how to collect samples.  WEISS was also responsible for ensuring COMMUNITY MOBILE TESTING INC's compliance with laws and

regulations.  He was intimately familiar with the requirement to collect insurance, but deliberately failed to train people to do so. The LABQ Co-CEO had many conversations with WEISS regarding collecting insurance in September, October and November of 2021.  Each time, instead of engaging meaningfully, WEISS would get up and leave.

**I.**     **Defendants rake in money from false billings.**

100.     LABQ is processing an average daily volume of 15,000 specimens per day.  At $125 per specimen, this averages to $675 million in annual revenue. Most of this revenue was fraudulently obtained by improperly billing the federal government for insured patients.

101.     LANDAU confirmed to two members of RELATOR, and a New York lab owner Aaron Domenico, that the company has collected $175,000,000 from COVID-19 testing in each of the last three quarters. LANDAU even showed Domenico bank statements confirming LABQ's cash receipts.  This is consistent with the numbers cited above.

102.     The benefits to LABQ of falsely billing HRSA for individuals with insurance are significant.  First, it generates revenue more quickly for LABQ because HRSA's reimbursement processing times are shorter than those with insurance.

103.     Second, LABQ benefits from billing HRSA because this system results in decreased expenses.  Routinely processing reimbursement statements for one payor is less complicated and utilizes fewer human capital resources than billing the proper payors. Insurance payors frequently ask for additional information before paying, and, unlike HRSA, often deny claims.  In short, it is exceedingly faster, easier and cheaper to bill HRSA than bill any other insurance provider.  There is less paperwork and virtually no rejections.

104.     LABQ has constructed hiring practices around the easy revenue generation provided by HRSA.  LABQ contracts for its billing data entry needs through a company in Ukraine that is owned by DEFENDANT LANDAU.  The LABQ Co-CEO has observed that

LABQ has only 4 billing full time employees who are responsible for responding to all insurance correspondence and rejections.

105.    Members of RELATOR, with decades of experience in the lab industry, note that it would be impossible for these people to handle even a small fraction of non-HRSA billing rejections with other insurance payors.  ENZO, another New York based clinical laboratory, has but 10% of LABQ's annual revenue ($70 million), yet it also has 1,000% as many billing clerks (40).  Like LABQ, ENZO has all billing data entry performed offshore, but must staff 40 billing employees to manage correspondence and rejections from insurance payors.  Healthcare data industry leader XIFIN estimates that approximately "40% of laboratory claims are known to have missing or inaccurate information,"[13] which then must be addressed by billing experts.

106.    If those numbers hold true here, by billing HRSA, LABQ avoids administrative costs associated with delays or rejections of payment on up to 40% of its claims. LABQ is able to generate hundreds of millions of dollars in revenue by pumping high volume claims to a federal agency that, in the midst of a pandemic, has been willing to rubberstamp payment.

107.    LABQ's practices cause an enormous cost to federal health care system as a whole.  LABQ's revenues increased from $15 million per quarter in 2020 to approximately $175 million in each of the last three quarters.  This revenue increase was driven largely by HRSA reimbursement for COVID-19 testing.

108.    DEFENDANT LANDAU has personally benefitted from this scheme as well. LANDAU owns a significant share of LABQ. He has taken profits out of LABQ and used those profits to invest in real estate. LANDAU, in his personal capacity, has bought other labs in

---

[13] XIFIN, "The Executive's Guide to Measuring Total Cost of Billing in the Laboratory," p. 3, available for download at https://www.xifin.com/resources/white-papers/executives-guide-measuring-total-cost-billing-laboratory.

Harlem, Texas and Florida. He also directed the LABQ Co-CEO to look up target investments in complementary lab service companies, such as in toxicology, anatomic pathology, and genetics.

**VI.    CAUSES OF ACTION**

### FIRST CAUSE OF ACTION
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

**(Against All Defendants)**

109.    RELATOR incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110.    DEFENDANTS knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

111.    These claims were false because, inter alia:

    a.    DEFENDANTS submitted claims to HRSA for patients with insurance.

    b.    DEFENDANTS submitted claims for reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

    c.    DEFENDANTS submitted claims for reimbursement for "rapid tests" even when rapid tests were not performed.

112.    DEFENDANTS knowingly caused to be presented false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by HRSA, which should have been obtained by private or public insurers. As described herein, DEFENDANTS were aware that LABQ had a

policy and practice of making false claims for payment, yet DEFENDANTS continued to submit such claims.

113.    The conduct of DEFENDANTS violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

114.    Wherefore, RELATOR prays for relief as further set forth below.

## SECOND CAUSE OF ACTION

**On Behalf of the United States**
**Federal False Claims Act, Making or Using False Records Material to a False Claim**
**31 U.S.C. § 3729(a)(1)(B)**

**(Against All Defendants)**

115.    RELATOR incorporates by reference and reallege all of the allegations contained in paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.    DEFENDANTS knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

117.    Those records or statements were false because, inter alia:

    a.    DEFENDANTS certified to the best of their knowledge, the patients did not have insurance, when in fact the DEFENDANTS never asked about insurance information or deliberately ignored the information they were provided;

    b.    DEFENDANTS created records or statements procured by means of, or otherwise involving, the payment of illegal kickbacks; and

    c.    DEFENDANTS represented that "rapid testing" had been performed when it had not.

118.     DEFENDANTS knowingly made, used, or caused to be made or used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, which were material to a false or fraudulent claim for payment or approval of charges by HRSA.

119.     The conduct of DEFENDANTS violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof. The United States relied on DEFENDANTS' false representations in making payment on DEFENDANTS' claims.

120.     Wherefore, RELATOR prays for relief as further set forth below.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs by and through RELATOR, pray judgment in its favor and against DEFENDANTS as follows:

1.     DEFENDANTS' conduct violated the Federal False Claims Act, and such conduct was a substantial factor in causing the United States to sustain damages in an amount according to proof.  That judgment be entered in favor of plaintiffs UNITED STATES OF AMERICA, ex rel. RESOLUTE 3 LLC, and against DEFENDANTS, according to proof, as follows:

   a.     On the **First Cause of Action** (Presenting or Causing to Be Presented False Claims (31 U.S.C. § 3729(a)(1)(A))), damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

      i.     Triple the amount of damages sustained by the Government;

      ii.     Civil penalties of Eleven Thousand Dollars ($11,000) for each false claim;

      iii.     Recovery of costs;

      iv.     Pre- and post-judgment interest; and

26

v.      Such other and further relief as the Court deems just and proper.

b.      On the **Second Cause of Action** (Making or Using False Records Material to a

False Claim (31 U.S.C. § 3729(a)(1)(B)), damages as provided by 31 U.S.C. §

3729(a)(1), in the amount of:

   i.      Triple the amount of damages sustained by the Government;

   ii.     Civil penalties of Eleven Thousand Dollars ($11,000) for each false claim;

   iii.    Recovery of costs;

   iv.     Pre- and post-judgment interest; and

   v.      Such other and further relief as the Court deems just and proper.

c.      Further, RELATOR, on its own behalf, pursuant to 31 U.S.C. section 3730(d),

requests that RELATOR receive such maximum amount as permitted by law, of

the proceeds of this action or settlement of this action collected by the United

States, plus an amount for reasonable expenses incurred, plus reasonable

attorneys' fees and costs of this action.  RELATOR requests that its percentage be

based upon the total value recovered, including any amounts received from

individuals or entities not parties to this action.

Dated: January 27, 2022                 **COTCHETT PITRE & MCCARTHY, LLP**

By: _____
NIALL P. McCARTHY (to be admitted pro hac vice)
BETHANY M. HILL (to be admitted pro hac vice)
KEVIN J. BOUTIN (to be admitted pro hac vice)
**COTCHETT PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nmccarthy@cpmlegal.com
bhill@cpmlegal.com
kboutin@cpmlegal.com

27

Dated: January 27, 2022          By: _____
                                 ALEXANDER E. BARNETT, AB7292
                                 **COTCHETT PITRE & McCARTHY, LLP**
                                 40 Worth Street, Suite 602
                                 New York, NY 10013
                                 Telephone: (212) 201-6820
                                 Facsimile: (917) 398-7753
                                 abarnett@cpmlegal.com

                                 *Attorneys for Relator Resolute 3 LLC*

## VIII.  DEMAND FOR JURY TRIAL

Relator RESOLUTE 3 LLC hereby demands a jury trial on all issues so triable.

Respectfully Submitted,

Dated: January 27, 2022

**COTCHETT PITRE & MCCARTHY, LLP**

By:

NIALL P. MCCARTHY (to be admitted pro hac vice)
BETHANY M. HILL (to be admitted pro hac vice)
KEVIN J. BOUTIN (to be admitted pro hac vice)
**COTCHETT PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nmccarthy@cpmlegal.com
bhill@cpmlegal.com
kboutin@cpmlegal.com

Dated: January 27, 2022             **COTCHETT PITRE & MCCARTHY, LLP**

By: _____
ALEXANDER E. BARNETT, AB7292
**COTCHETT PITRE & MCCARTHY, LLP**
40 Worth Street, Suite 602
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

*Attorneys for Relator Resolute 3 LLC*