```
                                            USDC SDNY
                                            DOCUMENT
UNITED STATES DISTRICT COURT                ELECTRONICALLY FILED
SOUTHERN DISTRICT OF NEW YORK               DOC #:_____
                                            DATE FILED: 03/20/2026
```

-----------------------------------------------------------------------X
          :
UNITED STATES OF AMERICA et al.,        :
          :
        Plaintiffs,        :
          :        22-cv-10313 (LJL)
      -v-         :        22-cv-00751 (LJL)
          :
LABQ CLINICAL DIAGNOSTICS, LLC et al.,      :    OPINION AND ORDER
          :
        Defendants.        :
          :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants LabQ Clinical Diagnostics, LLC ("LabQ"), Dart Medical Laboratory, Inc. ("Dart"), Community Mobile Testing, Inc. ("CMT," and with LabQ and Dart, "Corporate Defendants"), and Moshe Landau ("Landau") (collectively, "Defendants") move, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss the United States' Amended Complaint-in-Intervention against them for failure to plead fraud with particularity and failure to state a claim for relief.  Dkt. Nos. 692, 694.

## BACKGROUND

### I.    The Relevant Parties

LabQ is a New York limited liability company that operated laboratories in New Jersey and Brooklyn, New York, and, during the relevant time period from September 2020 to March 2022, performed COVID-19 testing for patients who lived in Manhattan and elsewhere.  Dkt. No. 493 ("AC") ¶ 18.  Dart is a diagnostic laboratory company incorporated in New York.  *Id.* ¶ 19.  CMT is a New York corporation which during the relevant time period operated over one hundred "LabQ Mobile Testing Sites" in New York City, including at least forty such sites in

Manhattan and the Bronx, at which it collected specimens from walk-up patients for the purpose of COVID-19 testing.  *Id.* ¶ 20.  It would provide the specimens it collected to LabQ for testing. *Id.*  Landau is Chief Executive Officer of LabQ, Dart, and CMT.  *Id.* ¶ 17.  He also was a member of LabQ and an owner and operator of CMT.  *Id.* ¶¶ 18, 20.

## II.    The Uninsured Program

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic.  In response, on March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA").  *Id.* ¶ 34.  One part of the FFCRA required private insurers to cover medically necessary COVID-19 testing without cost-sharing or prior authorization during the emergency period which began with the enactment of the FFCRA.  *Id.*; Sec. 6001 (Division F), Pub. L. No. 116-127, 134 Stat. 182 (2020).

Congress also required that government health programs, such as Medicare and Medicaid, cover medically necessary COVID-19 testing for persons enrolled in such programs. AC ¶ 34; FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 202–208 (2020).

The third portion of the law, relevant here, appropriated finite sums of funds that permitted the Department of Health and Human Services ("HHS") to reimburse healthcare providers for COVID-19 testing claims of "uninsured individuals." AC ¶ 35.

The FFCRA defined uninsured individuals as:

an individual who is not enrolled in—

(1) a Federal health care program (as defined under section 1128B(f) of the Social Security Act (42 U.S.C. 1320a-7b(f)), including an individual who is eligible for medical assistance only because of subsection (a)(10)(A)(ii)(XXIII) of Section 1902 of the Social Security Act; or

(2) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market (as such terms are defined in section 2791 of the Public Health Service Act (42 U.S.C. 300gg-91)), or a health plan offered under chapter 89 of title 5, United States Code.

Pub. L. No. 116-127, 134 Stat. 178, 182 (2020).

On March 27, 2020, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), which appropriated $100 billion to the Public Health and Social Services Emergency Fund for healthcare providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116–136, 134 Stat. 281 (2020). Additional amounts were appropriated through the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), Pub. L. No. 116-139, 134 Stat. 620 (2020), and the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 40. AC ¶ 35. HHS used funding from the CARES Act, PPPHCEA, and ARPA to support healthcare-related expenses attributable to COVID-19 testing for the uninsured. *See id.*

### A.    The Administration of the Uninsured Program

The Health Resources and Services Administration ("HRSA"), an agency within HHS, established and administered the program to reimburse providers who tested individuals without healthcare coverage, formally titled *The COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program*, often known as the "Uninsured Program" (hereafter, the "Uninsured Program" or "UIP"). AC ¶ 36.

The submission of claims to the Uninsured Program by providers involved several steps. *Id.* ¶ 37. First, health care providers were required to enroll in the Uninsured Program through an online portal known as the "UIP Portal," and to submit a patient roster providing identifying information regarding the uninsured patients for whom the provider was seeking reimbursement. *Id.* In order to upload a patient roster, the provider had to make attestations to HRSA regarding its patients. *Id.* Up until on or about June 18, 2021, the patient roster attestation required the provider to make four attestations, as follows:

3

> I have read and agree to the applicable HRSA COVID-19 Uninsured Program Terms and Conditions for Testing or Treatment Services. I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation.
>
> I attest that I have checked for health care eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient.
>
> I agree that I will accept the defined program reimbursement, as determined and/or adjustment by Health Resources & Services Administration (HRSA), as payment in full and will not balance bill the patient. I further understand that reimbursement is subject to available funding for the program.
>
> I acknowledge that I may be asked to submit to the review process established by HRSA, including its contractor to determine whether payments were made correctly. Additionally, upon request by HRSA or its contractor, I will provide any and all information related to the disposition or use of the funds received under the HRSA COVID-19 Uninsured Program for auditing and/or reporting purposes.

Dkt. No. 493-1.

The first attestation was revised effective from on or about June 18, 2021 and remained in place until the end of the Uninsured Program to read:

> I have read and agree to the applicable HRSA COVID-19 Uninsured Program Terms and Conditions (PDF). I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation.

*Id.* The other attestations remained the same including the attestation that the provider "checked for health care coverage eligibility." *Id.*

Until on or about May 31, 2021, the Terms and Conditions provided in relevant part as follows:

> I hereby attest to the following Terms and Conditions on behalf of the provider with the Tax Identification Number associated with this attestation ("Recipient"). I further attest that I am authorized to make such attestations on behalf of the Recipient. The Terms and Conditions below are not an exhaustive list and the Recipient agrees to comply with any other applicable statutes and regulations.

The Recipient plans to submit claims for reimbursement for COVID-19 Testing and/or Testing-Related Items and Services provided to FFCRA Uninsured Individuals (as those terms are further defined below). The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions.

The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made

. . .

The Recipient certifies that it, or its agents, provided the COVID-19 Testing and/or Testing-Related Items and Services on the Recipient's claim form to the FFCRA Uninsured Individuals identified on the claim form; that the dates of service occurred on February 4, 2020, or later; and that all items and services for which Payment is sought were medically necessary. The Recipient also certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided.

First Uninsured Program Terms and Conditions, *available at*

https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-

fund.pdf (last accessed March 19, 2026) (hereinafter "First Terms & Conditions").

Up to on or about May 31, 2021, the Terms and Conditions defined FFRCA Uninsured

Individuals to mean:

individuals who, as of the date of service for which Recipient seeks Payment, are not enrolled in—

- A Federal health care program (as defined under section 1128B(f) of the Social Security Act (42 U.S.C. 1320a-7b(f)), including an individual who is eligible for medical assistance only because of subsection (a)(10)(A)(ii)(XXIII) of Section 1902 of the Social Security Act; or

- A group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market (as such terms are defined in section 2791 of the Public Health Service Act (42 U.S.C. 300gg-91)), or a health plan offered under chapter 89 of title 5, United States Code.

5

First Terms & Conditions; *see* AC ¶ 40.  After May 31, 2021, an updated set of terms and conditions defined "Uninsured Individuals" as "individuals who did not have any health care coverage at the time the services were provided."  *Id.* ¶¶ 40 n.3, 120; *see* Uninsured Program Terms and Conditions, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf (last accessed March 19, 2026) (hereinafter "Updated Terms & Conditions").

After a provider submitted a patient roster and related attestations through the UIP Portal, a Government contractor, Optum, performed a patient eligibility check and, so long as the patient eligibility check did not identify health insurance for an individual on the patient roster, issued a Temporary Patient ID for that patient.  *Id.* ¶¶ 42, 134.  If Optum found that the patient had insurance, it would not issue a Temporary Patient ID.  *Id.* ¶ 134.  Optum's patient eligibility check was dependent upon whether the provider included a Social Security number for the patient.  If the provider provided a Social Security number, Optum would use that information to check on health care insurance; if the provider did not provide a Social Security number, Optum would issue a Temporary Patient ID without checking for health care insurance.  *Id.* ¶¶ 42, 134. Once the provider had a Temporary Patient ID for a patient, it could submit a claim for reimbursement to the Uninsured Program by using that Temporary Patient ID in claims submissions made through the Medicare Electronic Data Interchange, a system widely used by health care providers.  *Id.* ¶ 42.

The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program.  Through these HCPCS codes, the providers identified the specific

services rendered. *Id.* ¶ 43. The Uninsured Program reimbursed providers as much as $100 for providing a COVID-19 test, and an additional $23.46 for the collection of specimens. *Id.*

HRSA also provided ongoing guidance to providers. *Id.* ¶ 44. For example, in May 2021, it published "Frequently Asked Questions" ("FAQs") and corresponding answers on the Uninsured Program's website. *Id.* One of the questions and the corresponding answer related to who was an "uninsured individual." *Id.* It stated:

> **Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?**
>
> For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have *any* health care coverage at the time services were rendered.
>
> . . .
>
> **What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?**
>
> If a claim was submitted to the HRSA COVID-19 Uninsured Program for a patient who was actually insured, the provider should receive a notice that the claim was not eligible for reimbursement.

*Id.* (emphasis added). The Uninsured Program's website also provided the following advice to providers:

> As part of this step, if you have direct contact with the patient, you should make best efforts to confirm that the patient was uninsured at the time the services were provided (i.e., for claims for COVID-19 Testing and Testing-Related Items and Services, verify that the patient does not have coverage through an individual or employer-sponsored plan, a federal health care program, or the Federal Employees Health Benefits Program; for claims for treatment of a COVID-19 diagnosis, verify that the patient did not have any health care coverage; for COVID-19 vaccine administration, verify that the patient did not have any health care coverage). If you do not have direct patient contact, you may rely on the attestation of the ordering health care provider that the patient's health coverage status is uninsured.

*Id.* ¶ 45.

On March 16, 2022, HRSA informed providers that, on March 22, 2022, the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment due to lack of sufficient funds. *Id.* ¶ 46.

**B.      Defendants' Participation in the Uninsured Program**

Landau formed LabQ with other investors in 2019. *Id.* ¶ 53. That same year, he and other investors also acquired Dart. *Id.*

Prior to the COVID-19 pandemic, LabQ and Dart's principal business consisted of providing blood testing diagnostic laboratory services to nursing home residents pursuant to agreements between LabQ and the nursing homes. *Id.*

Shortly after the start of the COVID-19 pandemic, Landau expanded LabQ and Dart's operations into COVID-19 testing. *Id.* ¶ 54. Landau formed and operated three different business lines related to COVID-19 testing: (1) LabQ entered into agreements with institutional customers, including New York-area nursing homes, schools and television production companies (the "Private Clients") to provide COVID-19 testing to the Private Clients' employees or other beneficiaries for a fixed price paid by the Private Clients on a per-test basis; (2) LabQ entered into agreements with individuals and companies that, in turn, secured relationships with institutions, such as school districts in California and a jail facility in Alabama (the "Referral Clients") whereby LabQ agreed to provide COVID-19 testing at no cost to the Referral Clients; and (3) LabQ provided COVID-19 tests to "walk-up" patients at numerous LabQ-branded vans and tents on the public streets in New York City operated by CMT. *Id.* ¶¶ 54–56.

Defendants' COVID-19 testing business was a tremendous success. In 2019, before launching the COVID-19 testing business, LabQ and Dart generated less than $5 million in total revenue. *Id.* ¶ 53. In 2020, after Defendants expanded into COVID-19 testing, they generated over $10 million in revenue. *Id.* ¶ 58. In 2021, they generated over $100 million in revenue. *Id.*

Payments from the Uninsured Program to Dart fueled Defendants' revenue growth. *Id.* ¶ 59. By March 2022, the Uninsured Program had paid approximately $130 million to Dart. *Id.*

The Government alleges that Defendants' success was the product of fraud. In particular, the Government alleges that Defendants submitted false claims to HRSA during the relevant period from September 2020 through March 2022 (the "Relevant Time Period"). The nub of the Government's claim is that Defendants relied on HRSA's Uninsured Program as a default payor and submitted claims for individuals whom it knew were not FFCRA Uninsured Individuals at the time of testing and where, prior to the submission of the patient name on a patient roster, it did not confirm health care eligibility. *Id.* ¶¶ 3–4. The Government alleges that this scheme manifested in varied yet interrelated ways. According to the Government, Defendants submitted false claims to the Uninsured Program for COVID-19 testing by: (1) double-billing and seeking reimbursement for COVID-19 testing from both insurance or private clients and the Uninsured Program for the same tests, *id.* ¶¶ 65–80; (2) failing to confirm whether patients were insured prior to billing the Uninsured Program, *id.* ¶¶ 83–105; (3) billing the Uninsured Program for COVID-19 tests, despite knowing that the patient had health insurance, *id.* ¶¶ 106–118; and (4) submitting claims to the Uninsured Program if private insurers refused to pay for the cost of services, *id.* ¶¶ 119–125. The Government also alleges that when other payors paid Defendants for the same testing for which the Uninsured Program had provided a reimbursement, Defendants failed to return the payments to the Uninsured Program and knowingly concealed and evaded their obligation to reimburse the Uninsured Program for double payments to which they were not lawfully entitled. *Id.* ¶ 126–132. The fraudulent conduct and submission of false claims is alleged to have affected all three business lines.

C.      **The End of the Uninsured Program**

On March 16, 2022, HRSA informed providers that, on March 22, 2022, the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment due to the lack of sufficient funds. *Id.* ¶¶ 46, 105.  The Government alleges that near the end of the Uninsured Program, LabQ and Dart had a policy whereby they simultaneously billed the Uninsured Program and commercial insurers for the same COVID-19 testing. *Id.* ¶ 127.

For example, on May 13, 2022, a third-party billing company employee emailed a LabQ employee with billing responsibilities to memorialize a prior telephone call the two had had to discuss claims previously submitted to the Uninsured Program. *Id.* ¶ 128.  The LabQ employee confirmed that the third-party employee had accurately described LabQ's processes when the third-party employee recited that some of LabQ's claims for reimbursement "are claims that were paid by HRSA, that now will be billed by Insurance and if paid, you will reverse the HRSA claim back." *Id.* ¶ 128.  That same LabQ employee later wrote the same billing company, copying Landau, and discussing "[c]laims that were paid" by both "HRSA" and "insurance." *Id.* ¶ 128.  In March 2022, Landau wrote to LabQ employees that "[w]e need a way to sometimes bill for both HRSA and insurance and if we [sic] paid from insurance we will pay back HRSA." *Id.* ¶¶ 79, 112.  In addition, in an email sent to Landau in July 2022, LabQ's third-party billing company stated that it "was told [by LabQ] that during the HRSA cutoff, if there are any issues with billing insurance, to bill HRSA as not to miss the deadline." *Id.* ¶ 112.

The Government alleges that LabQ and Dart never returned any funds to HRSA on or after March 1, 2022, despite knowing, by July 2022 at the latest, that they had been paid by HRSA and commercial insurers for the same exact COVID-19 testing. *Id.* ¶ 130.

10

**PROCEDURAL HISTORY**

This case arises out of two qui tam actions filed by relators in 2022. On January 28, 2022, Relator Resolute 3 LLC filed a qui tam complaint in this District on behalf of the United States against the LabQ, CMT, Landau and others. *United States et al. v. LabQ Clinical Diagnostics, LLC*, No. 22-cv-00751 (S.D.N.Y. filed Jan. 28, 2022). The case was assigned to the undersigned. On May 27, 2022, a different private relator, NJ Challenger LLC, filed a qui tam complaint against Defendants in the United States District Court for the Eastern District of New York. Dkt. No. 1. The case was ordered transferred to this District on November 16, 2022. Nov. 16, 2022 Minute Entry. The case was assigned to the undersigned on April 11, 2023. The Government filed its complaint in intervention on June 13, 2024 in both cases and the case was unsealed. Dkt. Nos. 10–11, 20.

On May 19, 2025, the Government filed its amended complaint in intervention. Dkt. No. 493. The amended complaint contains eight claims for relief against Defendants. The first claim alleges that Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the Uninsured Program for COVID-19 testing in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A). *Id.* ¶¶ 182–87. The Government alleges that the claims submitted by Defendants were false or fraudulent because "(A) the cost of the COVID-19 testing had been (or would be) reimbursed by another source, and/or (b) the COVID-19 testing was provided to persons who had health care coverage on the relevant date of the service." *Id.* ¶ 184. The second claim for relief alleges that Defendants knowingly made, used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims for payment to the Uninsured Program, in violation of 31 U.S.C. § 3729(a)(1)(B). The Government alleges that the false records and statements included the false attestations and

11

certifications that LabQ and/or Dart submitted to the Uninsured Program.[1]  *Id.* ¶ 190.  The third

claim for relief alleges that LabQ, Dart, and Landau knowingly concealed and/or knowingly

improperly avoided their obligation to reimburse the Uninsured Program for the payments for

tests to which these Defendants were not lawfully entitled in violation of 31 U.S.C.

§ 3729(a)(1)(G).  *Id.* ¶¶ 194–97.  The Government also asserts common law claims for unjust

enrichment and payment by mistake as well as three claims for relief under the Federal Debt

Collection Procedures Act ("FDCPA").  *Id.* ¶¶ 198–217.

On August 18, 2025, Defendants filed these motions to dismiss.  Dkt. Nos. 692, 694.  The

motions were supported by memoranda of law in support and, in the case of the motion to

dismiss by Dart and LabQ, by the declaration of Lee Vartan, Esq.  Dkt. Nos. 693, 695–96.  On

November 25, 2025, the Government filed its memorandum of law in opposition to the motions

to dismiss.  Dkt. No. 808.  On January 28, 2026, Defendants filed a reply memorandum in

further support of their motions to dismiss.  Dkt. No. 840.

The Court held argument on the motions to dismiss on March 9, 2026.  Dkt. No. 860.

Following the argument, the parties submitted letters addressing the Court's ability to dismiss

portions of the Government's claim under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B).  Dkt. Nos.

868, 871.

---

[1] The AC includes as part of these false attestations the certification that "if LabQ and/or Dart Medical subsequently received reimbursement for any items or services for which they requested payment from the Uninsured Program, LabQ and/or Dart would return to HHS that portion of the HRSA payments which duplicates payment or reimbursement from another source."  AC ¶ 190. Following oral argument, the Government clarified that it "does not intend to pursue any theory that any certifications by FCA Defendants that they will return payments in the future gives rise to any *direct* False Claims Act liability under 31 U.S.C. §§ 3729(a)(1)(A) or (a)(1)(B)."  Dkt. No. 871 at 2 n.2.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

"[C]laims under the FCA—including reverse false claims—are subject to the heightened pleading standard found in Federal Rule of Civil Procedure 9(b)." *Miller v. United States ex rel. Miller*, 110 F.4th 533, 543 (2d Cir. 2024). Under Rule 9(b), plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent; (2) identify the speaker; (3) state where and when the statements (or omissions) were made, and (4) explain why the

statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *see also Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (stating that to plead fraud with particularity, a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations" and "should explain how the misrepresentations were fraudulent"). Allegations that are "conclusory and unsupported by assertions of fact" are not sufficient to meet the Rule 9(b) standard. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

A complaint alleging a FCA violation also must allege with particularity "the circumstances constituting fraud." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 83 (2d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)). "It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills." *Id.* at 84 (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). It also must plead that "false records were actually presented to the government for reimbursement." *Id.* The submission requirement usually requires the plaintiff to "provide details of actual bills or invoices submitted to the government." *Id.* at 93. "In cases with extensive schemes, plaintiffs can satisfy this requirement in two ways: (1) providing sufficient identifying information about all the false claims, or (2) providing example false claims." *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 258 (S.D.N.Y. 2014); *see United States ex rel. Levine v. Vascular Access Centers L.P.*, 2020 WL 5534670, at *5 (S.D.N.Y. Sept. 15, 2020). Alternatively, a FCA complaint can satisfy the submission requirement when a qui tam relator "makes plausible allegations . . . that lead to a strong inference that specific claims were indeed submitted and that information about the details of the claims submitted are peculiarly within the opposing party's

14

knowledge." *Chorches*, 865 F.3d at 93; *see also id.* at 86; *Pilat v. Amedisys, Inc.*, 2024 WL 177990, at *2–3 (2d Cir. Jan. 17, 2024) (summary order).

## DISCUSSION

The Government brings claims for presentation of false or fraudulent claims in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), use of false statements in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B), knowingly and improperly avoiding an obligation to repay the government in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), unjust enrichment, payment by mistake by the Government, and fraudulent transfers in violation of the FDCPA, 28 U.S.C. § 3304(a)(1), (b)(1)(A), and (b)(1)(B).  AC ¶¶ 182–217.  Defendants move to dismiss the Government's claims under the FCA and the Government's common law claims of unjust enrichment and payment by mistake for failure to state a claim.  Dkt. No. 693 at 5–8.[2]

In regard to the direct FCA claims, under 31 U.S.C. § 3729(a)(1)(A) and (B), Defendants argue that the Government has failed to plead falsity, materiality or scienter with the particularity required by the FCA.  Dkt. No. 693 at 4–6.[3]  Defendants level a broad, and somewhat scattered, attack on the Government's pleading.  They assert that the complaint does not make out a claim for relief in connection with the claims submitted for tests administered at Defendants' mobile testing sites because Defendants confirmed patients' testing status by providing patients intake forms (often in digital form) that contained fields where patients could input their insurance information.  Dkt. No. 693 at 30–31.  To the extent that patients filled out such forms incorrectly

---

[2] Defendants also move to dismiss the Government's claims under the FDCPA as dependent on the Government's FCA and common law claims.  Dkt. No. 693 at 8–9.  Defendants make no other argument in favor of dismissal.  As the Court finds that the Government has stated a claim under its FCA and common law claims, the motion to dismiss the FDCPA claims is denied.

[3] LabQ and Dart filed a separate motion to dismiss, but join in the arguments made by CMT and Landau.  Dkt. No. 695 at 1 n.1.  Landau and CMT also join in the arguments made by LabQ and Dart.  Dkt. No. 693 at 1 n.1.

or not at all, Defendants assert that they are not responsible for the error.  Dkt. No. 868 at 2.

Defendants further assert that they cannot be liable for submitting claims on behalf of patients

who had heath insurance coverage that did not cover the COVID-19 tests.  Dkt. No. 693 at 21.

In their view, the attestations asked whether the cost for the test would be covered by another

provider and the program did not require them to bear the cost where an insurance program

failed to pay.  *Id.* at 22–23.  Further, LabQ and Dart assert that any claims submitted on behalf of

patients with Medicare or Medicaid coverage are not false claims.  Dkt. No. 695 at 21.  The UIP

covered patients who were enrolled in a Medicaid program that did not cover COVID-19 tests.

*Id.* at 16.  There was no ready way for Defendants to determine (or indicate on an attestation)

that the patient had health insurance but not insurance that did not cover the COVID-19 test.

Accordingly, they assert that they could submit such claims and leave it to Optum to figure out

whether the claim was a permitted one or not.  *Id.*  These are all potentially powerful arguments.

But the Court need not now address them, and many of the other arguments made by Defendants,

to determine whether Defendants are entitled to the relief that they seek.  *See Opternative, Inc. v.*

*JAND, Inc.*, 2019 WL 624853, at *6 (S.D.N.Y. Feb. 13, 2019) (the Court "need not decide

whether [the Government] has stated a claim . . . based on all [] theories of liability—it is enough

that it has stated a claim based [on] one of those theories"); *see also Talkdesk, Inc. v. Unique*

*Travel Corp.*, 2024 WL 4904684, at *3 n.5 (S.D.N.Y. Nov. 27, 2024) (plaintiff "need only

plausibly plead one theory for the claim to survive dismissal").

Defendants have made a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) and the relief that they seek is an order dismissing the Government's amended

complaint in intervention.  Dkt. Nos. 692, 694.  Accordingly, the principal question for the Court

is whether the amended complaint "contain[s] sufficient factual matter, accepted as true, to 'state

a claim for relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570), so as to allow the case to proceed to discovery. *Twombly*, 550 U.S. at 558. The inquiry is whether there exists a claim for relief; not whether some allegations, but not others, would support that claim. *See Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022) (the conclusion that a motion to dismiss cannot be used to dismiss parts of claims "flows from the plain language of Rule 12(b)(6)"); *Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014) ("A plain reading of Rule 12(b)(6) indicates that the rule may be used only to dismiss a 'claim' in its entirety."). "By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery, even for claims that are likely to fail." *Berk v. Choy*, 146 S. Ct. 546, 553 (2026).[4]

The Court has the authority in determining whether a complaint states a claim for relief to parse through the alternative theories alleged by the plaintiff and to express a view as to whether any particular alternative viewed in isolation would be sufficient. *See Ortiz v. Consolidated Edison Co. of N.Y., Inc.*, 801 F. Supp. 3d 260, 274 (S.D.N.Y. 2025) ("[T]he notion that a pleading will not be dismissed if at least one of the alternative theories of relief is adequately pled, does not preclude the alternative claims from being dismissed if they do not state a cause of actions." (quoting *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 451 (E.D.N.Y. 2012))). It does not have the obligation to do so. *See* Fed. R. Civ. P. 8(d)(2) ("[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically" and "the pleading is sufficient if

---

[4] If a party seeks to narrow the factual issues at trial by challenging parts of a plaintiff's claims, "such a challenge would be appropriate at summary judgment." *Fed. Trade Comm'n*, 581 F. Supp. 3d at 60 (quoting in parenthetical *FTC v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1246 (D. Utah 2019)). As distinct from Rule 12(b)(6), Rule 56 "explicitly allow[s] for '[p]artial [s]ummary [j]udgment" and require[s] parties to 'identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.'" *BBL, Inc. v. City of Angola*, 809 F.3d a317, 325 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (emphasis in original).

any one of them is sufficient"). "At the motion to dismiss stage, [] the court need not conclusively determine on which theory the case moves forward." *Reinhardt v. City of Buffalo*, 2022 WL 2442300, at *19 (W.D.N.Y. July 5, 2022); *see also Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C.*, 2022 WL 3214924, at *7 (S.D.N.Y. Aug. 9, 2022) (since the plaintiff "pled plausibly the adverse employment action element of each claim for relief[,] [t]he Court need not and will not parse through what other allegations may or may not qualify as an adverse employment action."); *City of Chicago v. Purdue Pharma L.P.*, 2021 WL 1208971, at *6 (N.D. Ill. Mar. 31, 2021) (where the complaint "does not purport to assert a separate claim" based on a set of allegations, "the Court need not determine now whether a claim based only on those allegations would survive, given that the claim will proceed beyond the pleading stage, regardless."). Defendants might seek through a motion to dismiss to "ask [a] Court to strike or eliminate portions of Plaintiffs' claims even if other portions remain in the case. But it is not for this Court to dissect Plaintiff's claims and excise allegations which purportedly [fail to support the claim] . . . Courts generally decline to dismiss only portions of a cause of action." *Tahbaz v. Vigilant Ins. Co.*, 778 F. Supp. 3d 480, 492 n.5 (D. Conn. 2025); *see also Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 283 n.6 (S.D.N.Y. 2024) ("[O]nce a court determines that a claim states a viable basis for relief, it cannot further parse out whether other portions of the claim would suffice on their own." (quoting *Fed. Trade Comm'n*, 581 F. Supp. 3d at 60)).

Defendants point out that they submitted approximately 1.114 million claims to the Uninsured Program and that to this date, "the Government still cannot say which and how many of those claims were allegedly privately insured at the time of submission to the UIP." Dkt. No. 695 at 1; *see also id.* at 13–16. The Court empathizes with Defendants' concern. But the Government is not required by Rule 12(b)(6) or by Rule 9 to identify every claim that is false. A

18

FCA complaint need only allege a scheme and representative samples of the alleged false claims. *Chorches*, 865 F.3d at 84 (finding adequate claim under FCA where complaint "puts forth particularized allegations of a scheme to falsify records" and "describes specific instances of the implementation of that scheme."); *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 289 (E.D.N.Y. 2016) ("'[I]n setting forth a complex and far-reaching scheme,' a relator need allege only 'representative samples' of fraudulent conduct to satisfy Rule 9(b)" (quoting *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 481–82 (S.D.N.Y. 2013))).  As to the samples, the complaint must specify the statements alleged to be fraudulent, identify the speaker, state where and when they were made, and explain why they were fraudulent.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  "[W]here the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct."  *United States v. Wells Fargo Bank, N.A.,* 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013) (quoting *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004)); *Chorches*, 865 F.3d at 81 ("[T]he adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific." (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015))).  So long as the complaint sufficiently alleges a scheme "such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims," *Wells Fargo*, 972 F. Supp. 2d at 617 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 511 (6th Cir. 2007)), Rule 12(b) and Rule 9 are satisfied.

## I.    The AC Sufficiently Alleges Direct FCA claims

The FCA imposes liability for false claims made to the United States government in a variety of ways, including the presentation of a false or fraudulent claim, the knowing use of

false record, and avoidance of a known obligation to repay.  The first and second of these arise when a party either "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B); *United States v. Strock*, 982 F.3d 51, 58 (2d Cir. 2020).  The third, a so-called "reverse" FCA claim, arises when one "knowingly makes, uses, or causes to be made or used, a false record or statement" or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G); *see Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024).

To succeed in alleging a direct false claim under Section 3729(a)(1)(A), the plaintiff must show that the defendant "(1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (summary order) (quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011)); *see* 31 U.S.C. § 3729(a)(1).  "An alleged 'misrepresentation about compliance with a statutory, regulatory or contractual requirement must be material to the Government's payment decision in order to be actionable' under the FCA." *Id.* (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016)).  Subsection (a)(1)(B) similarly requires a plaintiff to show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Kester*, 23 F. Supp. 3d at 252.  "Simply put, a direct false claim involves a request for government funds knowingly made under false pretenses." *United States ex rel. Thomas v. Premier Home Health Care Servs., Inc.*, 2025 WL 3002967, at *3 (S.D.N.Y.

20

Oct. 27, 2025).  The plaintiff must allege both knowledge and materiality under both subsections. *Escobar*, 579 U.S. at 192 ("[T]he [FCA]'s materiality and scienter requirements" are "rigorous.").  "A failure to adequately plead either of these requirements is fatal to a relator's claim."  *Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*, 2023 WL 7130553, at *2 (2d Cir. Oct. 30, 2023) (summary order); *see e.g., Strock*, 982 F.3d a 65–66.

"Courts do not always distinguish between the two subparagraphs [(a)(1)(A) and (a)(1)(B)], and both are often involved in the same case.  For example, a false claim for payment under (a)(1)(A) may be made in the form of a record or statement, which also would support an allegation under (a)(1)(B)."  Claire M. Sylvia, The False Claims Act: Fraud Against the Government, § 4:1 (2024); *see also Bernstein v. Silverman*, 2024 WL 3595621, at *23 (N.D.N.Y. July 31, 2024) ("[T]he elements for a count brought under section 3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A)."); *U.S. v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994) (stating that for a claim under former subsections (a)(1) or (a)(2), now (a)(1)(A) and (a)(1)(B), the Government must show the existence of a request for payment and that this request was fraudulent); *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *Laymon, Jr. v. Bombardier Transp. (Holdings) USA, Inc.*, 2009 WL 793627, at *8 (W.D. Pa. Mar. 23, 2009) (observing that where the false claim for payment is made by a false statement or record, the inquiries under sections (a)(1)(A) and (a)(1)(B) are coterminous); *United States v. Strock*, 2018 WL 647471, at *6 (W.D.N.Y. 2018) (noting courts often analyze (a)(1)(A) and (a)(1)(B) together because elements overlap significantly); *U.S. ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82 (D.D.C. 2018) (finding that false claim and false statement causes of action based on same factual allegations may both proceed); *U.S. ex rel. Gardner v. Vanda Pharm., Inc.*, 2020 WL

2542121, at *8 n.6 (D.D.C. 2020) (not distinguishing between (a)(1)(A) and (a)(1)(B) because elements are "practically identical") (quoting *U.S. ex rel. Scott v. Pac. Architects & Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146, 154 (D.D.C. 2017)).

The Government alleges that one way in which the alleged fraudulent scheme was manifested was through double-billing—Defendants billed both the UIP and private insurance or some other payor for the same COVID-19 test administered on the same day to the same patient. AC ¶ 65. Although Defendants challenge other of the Government's theories, they do not dispute that the double-billing (if it occurred) would violate the FCA and state a claim under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). Dkt. No. 874 ("Mar. 9 Tr.") at 23:6–17 ("the majority of the complaint and the patients . . . those almost exclusively revolve around the government's double billing scheme. We're not asking—at least I'm not asking here, your Honor, to dismiss those claims. We will resolve those at summary judgment, at trial.").

### A.    Allegation of False Claim

The AC alleges false claims. The FCA does not define "what makes a claim 'false' or 'fraudulent'" and courts therefore follow the "settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common law term it uses." *Escobar*, 579 U.S. 176 at 188 (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)). In defining whether a claim is false or fraudulent, the Second Circuit has thus relied on common law understandings of fraud. *See Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 107 (2d Cir. 2017) (citing Restatement (Second) of Torts § 525 cmt. b (1977) for definition of "misrepresentation"); *see* Restatement (Second) of Torts § 525 cmt. b (1977) (defining "misrepresentation" to include "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth."). "At common law, 'fraud' was a term with expansive reach." *Kousis v. United States*, 605 U.S. 114, 125 (2025); *see* West's Federal

22

Admin. Practice § 616 ("The term 'false or fraudulent' in the False Claims Act will receive broad construction.").

Under the FCA, claims and statements may be factually false or legally false. *See United States ex rel. Quartararo v. Catholic Health System of Long Island Inc.*, 84 F.4th 126, 130 (2d Cir. 2023); *United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 408 (S.D.N.Y. 2014) ("A certification may be either factually or legally false."). A claim or certification is factually false when it includes "an incorrect description of goods or services provided." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 104 n.7 (2d Cir. 2021) (quoting *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011)). The archetypal factually false claim is "when a contractor delivers a box of sawdust to the military but bills for a shipment of guns." *United States v. PharMerica Corp.*, 2022 WL 4280391, at *6 (S.D.N.Y. Sept. 15, 2022) (quoting *Bishop v. Wells Fargo & Co.*, 823 F.2d 35, 43 (2d Cir. 2016), *vacated on other grounds*, 579 U.S. 176 (2016)). "A claim is legally false when it falsely certifies—expressly or impliedly—compliance with a governing statutory, regulatory, or contractual provision." *Catholic Health System*, 84 F.4th at 130. "When . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Escobar*, 579 U.S. at 187.

The AC alleges legal falsity.[5] Defendants submitted attestations that certified compliance with HHS's terms and conditions and certified that Defendants had checked for

---

[5] The Government does not allege that Defendants submitted claims for COVID-19 tests that were not performed or that Defendants submitted claims for procedures other than COVID-19 testing. *See Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001), *abrogated on other grounds*, 579

health care eligibility and confirmed that the patient did not have insurance and no one else would reimburse for the COVID-19 testing when, in fact, Defendants knew that the patient had insurance and that another payor would pay for the test. In particular, the Government alleges that "Landau, Dart Medical, and LabQ engaged in a double-billing scheme whereby they submitted (or caused to be submitted) thousands of claims for reimbursement to the Uninsured Program for COVID-19 tests for which they also sought and received payments from Private Clients, other federal health care programs, and private insurance companies." AC ¶ 65. The complaint provides particularized examples of such false claims. The Government alleges that for five patients at nursing homes and five patients in a UN mission, Defendants billed the Uninsured Program for COVID-19 testing despite knowing that the nursing homes and UN mission, respectively, would reimburse the claims. *Id.* ¶ 68–70. The Government further alleges that for Patient 13, two claims were submitted to the Uninsured Program after they had been submitted to a private insurer. *Id.* ¶ 72. For each of these claims, the Government has identified (1) the false statement: the attestation that patient did not have insurance or federal healthcare coverage and that no other payor would reimburse the COVID-19 test; (2) who made them: LabQ and Dart; (3) the exact dates when the false statements were made; and (4) why the attestation was false: the claims would be reimbursed by an institution or the patient had a private insurer. These allegations are sufficient to plead false statements with particularity. *See Chorches*, 865 F.3d at 81 (noting that Rule 9(b) "ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

---

U.S. 176 (2016) (noting as example of a factually false claim one that "seeks reimbursement for a service not provided").

(3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016)).

### B.    Materiality

The AC also alleges materiality.  LabQ and Dart argue that the AC is deficient because "[t]he only thing material to the Government's decision to pay was whether Optum issued a Temporary Patient ID or not."  Dkt. No. 695 at 2; *see also id.* at 19.  Landau and CMT similarly argue that "Defendants' attestations and certifications could not actually impact the government's payment determination" due to the Optum checks.  Dkt. No. 693 at 36.

A statement or claim is "material" under the FCA when it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Bernstein*, 2024 WL 3595621, at *16 (quoting 31 U.S.C. § 3729(b)(4)).  "[U]nder *Escobar,* relevant factors in evaluating materiality include: (1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was 'minor or insubstantial.'" *AECOM*, 19 F.4th at 110 (quoting *Escobar*, 579 U.S. at 194–95); *accord Lee v. N. Metro. Found. for Healthcare, Inc.*, 2022 WL 17366627, at *1 (2d Cir. Dec. 2, 2022) (summary order).  "No one factor is dispositive" and a court's "inquiry is holistic." *Id.* (citation omitted).  However, "[t]he materiality standard is demanding." *Escobar*, 579 U.S. at 194. "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* (internal citation omitted) (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

The AC satisfies all three factors.  The first factor is "relevant, but not automatically dispositive." *Escobar*, 579 U.S. at 194.  It is satisfied.  The Government expressly designated

compliance with the terms and conditions of the Uninsured Program as a condition of payment. When submitting the patient roster and each claim therein to HRSA, LabQ and Dart certified that they read and agreed to the terms and conditions.  Dkt. No. 493-1.  The terms and conditions themselves stated that Defendants' "full compliance with all Terms and Conditions [wa]s material to the Secretary's decision to disburse funds" to them and that "[n]on-compliance with any Term or Condition [wa]s grounds for the Secretary to recoup some or all of the payments made."  AC ¶ 41 (quoting First Terms & Conditions).

The Government's allegations regarding their response to noncompliance with the terms and conditions "add some support to its allegations of materiality." *Strock*, 982 F.3d at 64.  The complaint "outlines the numerous steps" the Government took to determine whether a person was an "Uninsured Individual" before it committed to making a payment. *Id.* at 65; AC ¶¶ 134– 35; *see Strock*, 982 F.3d at 65 ("pre-award response to noncompliance . . . add[s] some support to its allegations of materiality" where the complaint "outlines the numerous steps the government takes to ensure an applicant is [eligible] before awarding a contract").  If Optum found that a patient had insurance, it would not issue a Temporary Patient ID and would reject the claim for COVID-19 testing.  AC ¶ 134.  The fact that a patient had insurance alone was dispositive in whether HRSA would deny the claim for reimbursement. *See United States v. Anthem Inc.*, 2022 WL 4815978, at *5 (S.D.N.Y. Sept. 30, 2022) ("[I]f [government agency] absolutely would have refused to pay had it known of the misrepresentation, that misrepresentation would certainly be material.").

Finally, as to the third factor, Defendants' alleged noncompliance was not minor or insubstantial.  The central feature of the Uninsured Program was to increase access to free COVID-19 testing by providing tests to individuals who did not have health insurance.  AC ¶ 34.

If Defendants, by double-billing, submitted claims to the Uninsured Program for individuals when they knew that there was another payor that could pay for those tests, that would defeat the goal of the Uninsured Program and ignore express eligibility requirements.  As the Court previously stated, "Defendants' noncompliance with the central program eligibility requirements was not minor or insubstantial but went to 'the heart of the[ir] bargain' with HRSA."  *LabQ*, 771 F. Supp. 3d at 446.

Defendants argue that the AC does not allege materiality because "Optum (on behalf of HRSA) performed patient insurance eligibility checks for patients whose Social Security Numbers had been provided" and performed post-payment retrospective insurance checks three times thereafter to check insurance status.  Dkt. No. 695 at 19 (quoting AC ¶ 134–35).  In essence, Defendants infer from the fact that Optum was checking for insurance that it must have known that claims were submitted for tests administered to persons who had insurance.  They argue that, even if Defendants' attestations were false, they were not designed to be capable of influencing HRSA's payment decision, because "the government's payment determination . . . was supposed to be based not on [Defendants'] 'records or statements' but rather (and entirely) on the independent intervening determination of a thirty party (Optum)."  Dkt. No. 693 at 37; Dkt. No. 695 at 19 (arguing that "what was material to the Government's payment decision was not anything Defendants claimed but what Optum claimed—initially and then three times thereafter.").  LabQ and Dart further point out that when Optum detected that the patient was in fact insured, the Government had a built-in mechanism by which to recoup funds: it would offset the amounts improperly paid against future claims submitted by the provider.  Dkt. No. 695 at 19.

The fact that HRSA conducted eligibility checks and offset the claims that it detected were improper does not establish that "Defendants' attestations and certifications could not actually impact the government's payment determination," Dkt. No. 693 at 36, and were therefore immaterial. HRSA required attestations because Optum would not necessarily be able to detect every claim that was improper. That on some occasions Optum would be able to detect improper claims thus does not relieve Defendants of responsibility for the submission of such claims in the first instance. *See United States v. Spectrum Painting Corp.*, 2020 WL 5026815, at *12 (S.D.N.Y. Aug. 25, 2020) (finding adequate pleading of materiality where Government alleged that if relevant agencies became aware of misrepresentation, they would have stopped payment). The Government has adequately alleged that Defendants' false claims and statements were material to HRSA's decision to pay.

### C.    Knowingly

"'Knowingly' means that a person '(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.'" *Strock*, 982 F.3d at 58–59 (quoting 31 U.S.C. § 3729(b)(1)(A)); *see also SuperValu Inc.*, 598 U.S. at 749 (holding that "knowingly" refers "to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed"); *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376–78 (D.C. Cir. 2000) (holding that a mere "misunderstanding" of legal entitlements is not sufficient to fulfill the "knowingly" standard under the FCA). "[A]ctual knowledge refers to whether a person is 'aware of' information." *SuperValu*, 598 U.S. at 751. "[T]he term 'reckless disregard' . . . captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway.'" *Id.* The FCA's knowledge standard

28

"tracks traditional common-law fraud." *SuperValu*, 598 U.S. at 752; *see Bernstein*, 2024 WL 3595621, at *18.

"Plaintiffs, including the government, still must 'plead the factual basis which gives rise to a strong inference of fraudulent intent.'" *Strock*, 982 F.3d at 66 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). The complaint must plead facts supporting scienter as to each defendant. *Id.* (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).

The Government has adequately alleged knowledge. Defendants could not have billed HRSA and some other payor for a claim if it did not know that there was some other payor who could pay the claim. For allegations of double billing, the Government alleges that Defendants had within their possession information that there existed another payor to whom to submit the claim (and thus that the patient had healthcare coverage or another payor who would reimburse the claim). *See Bernstein*, 2024 WL 3595621, at *19 (complaint adequately alleged that institutional defendants had knowledge of fraudulent behavior where relator alleged that she made reports to hospital and university leadership). The Government further alleges specific instances where a patient provided insurance information when getting her COVID-19 test but LabQ and Dart falsely attested to HRSA that she was uninsured and, on that basis, received reimbursement from the Uninsured Program. AC ¶ 108 (LabQ submitted claim to the Uninsured Program on four separate occasions for Patient 21, despite her providing health insurance); *id.*

29

¶ 109 (Patient 17 submitted her health insurance and policy number on LabQ's intake form but LabQ billed the Uninsured Program for her COVID-19 test); *id.* ¶ 110 (LabQ submitted claims to the Uninsured Program for staff and students at a school despite receiving insurance information).

Defendants respond that they engaged in a "commonplace, legitimate practice of coordinating benefits" that does not constitute an impermissible "double billing" scheme. Dkt. No. 693 at 33. Defendants assert that the Uninsured Program, unlike other federal programs, did not "set any order of billing where multiple payors may be responsible for payment of a claim," *id.* at 34, and conclude that in the absence of a set billing order, they were permitted to submit claims to multiple potential payors as they saw fit and subsequently issue any necessary refunds. But that argument misstates the manner in which the Uninsured Program functioned. Only claims that were not covered by another payor could be submitted to the UIP. *See* Dkt. No. 493-1 (Patient Roster Attestation). Thus, the only reason the Uninsured Program did not have an order of billing as such is because there would have been no need for such an order. Providers attested that the Uninsured Program was the only available payor—the attestation required them to state that they both checked and confirmed that the individual did not have any other source of health care coverage or any other source of COVID-19 testing reimbursement. Dkt. No. 493-1. The plain language is inconsistent with a practice of simultaneous billing. "The language [of the attestation] was unqualified. It required Defendants to check and confirm first, bill later." *LabQ*, 771 F. Supp. 3d at 457.

Defendants also argue that they did not knowingly violate the FCA because terms and conditions contemplate coordination of benefits by requiring a provider to withdraw its claim or reimburse HRSA if it "subsequently receives reimbursement." First Terms & Conditions. The

30

scienter that is required for a violation of the FCA is that the claims and statements submitted to the Government are false. It is not that the defendants intended to defraud the Government, *see United States ex rel. Gordon v. Shiel Med. Lab'y*, 2025 WL 949432, at \*19 (E.D.N.Y. Mar. 29, 2025), or that the defendants knew that they were violating federal law, *see United States ex rel. Forcier v. Comput. Sci. Corp.*, 183 F. Supp. 3d 510, 525 (S.D.N.Y. 2016) (Defendant's argument that it "complied with all legal requirements" when certifying to Medicaid that a claim was not payable from another source does not undermine allegations that Defendants knew they submitted dummy patient IDs to insurance and knew those claims would be denied.).

Moreover, that HRSA supplied guidance to providers on how to correct improper claims to the Uninsured Program does not indicate that HRSA endorsed a practice of submitting such claims; it affirms that HRSA viewed such claims as impermissible. *See LabQ*, 771 F. Supp. 3d at 456 ("Requirements for how to address inevitable errors do not vitiate the requirement to confirm a patient is uninsured before billing HRSA."). The AC alleges that at the time submissions were made, Defendants understood that double billing was impermissible. *See, e.g.*, AC ¶ 75 ("LabQ's former billing specialist . . . testified . . . that LabQ 'obviously' could not bill the Uninsured Program for claims already paid by private payors"); *id.* ¶ 82 (LabQ billing employee stated, "In a case where we find insurance we have to bill their insurance carrier, not the government."). The Government has sufficiently alleged that Defendants knew its claims and statements were false and understood at the time the claims were submitted that such double billing was impermissible. *See SuperValu*, 598 U.S. at 743, 754 ("[A]mbiguity alone is not sufficient to preclude a finding that respondents knew their claims were false" if there is evidence that they "correctly understood the relevant standard and submitted inaccurate claims anyway.").

31

Finally, Defendants argue that they did not violate the FCA because they assumed that Optum would check for eligibility after the patient roster was submitted and thus, when they received a temporary Patient ID, they also assumed that the patient qualified for coverage by the UIP.  Dkt. No. 693 at 24; Dkt. No. 840 at 12.  The Government need only prove that the Defendants acted with knowledge of the statement's falsity not that the Defendants also knew that their false statements were material.  *See U.S. v. Karron*, 750 F. Supp. 2d 480, 491 n.9 (S.D.N.Y. 2011) (plaintiff is no longer required "to show that a defendant intended that the false record or statement be material to the Government's decision to pay").  Even a belief that HRSA would check after a patient roster was submitted does not mean that Defendants could not have had scienter when submitting the patient roster.  Nor does the fact that Optum provided a temporary Patient ID mean that Defendants could not have acted with scienter when submitting those claims for which they knew—because they also made claims against private insurance or to another payor—that there was someone else who was providing coverage for the patient.

The Government has adequately alleged falsity, materiality, and scienter so as to state a claim under Section 3729(a)(1)(A) and (B) of the FCA.  Defendants' motion to dismiss these claims is denied.

## II.    The Reverse FCA Claim

The Government's third claim for relief alleges violations of the "reverse claim" provision of the FCA, 31 U.S.C. § 3729(a)(1)(G).  Dkt. No. ¶¶ 194–97.  Section 3729(a)(1)(G) "imposes liability for failing to pay to the government money that a party owes, rather than from fraudulently obtaining them from the government."  *United States v. Omnicare, Inc.*, 2021 WL 1063784, at *11 (S.D.N.Y. Mar. 19, 2021).

Section 3729(a)(1)(G) provides that a defendant incurs liability under the FCA when it

> Knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).

The Government alleges that LabQ, Landau and Dart, knowing that they had submitted or caused to be submitted claims for reimbursement to the Uninsured Program where the cost of the COVID-19 testing had been reimbursed by another source, knowingly concealed and/or knowingly improperly avoided their obligation to reimburse the Uninsured Program for these payments to which the Defendants were not lawfully entitled.  Dkt. No. 493 ¶ 196.

Landau and CMT argue that the third claim for relief should be dismissed as duplicative of the Government's direct FCA claims and for failure to allege an independent "obligation" to pay the government.  Dkt. No. 693 at 38–41.  They also argue that the Government has failed to allege that the Defendants acted "knowingly and improperly."  31 U.S.C. § 3729(a)(1)(G).  *See* Dkt. No. 493 at 41–42.

"Under the reverse false claim provision, a relator must plead the existence of an 'obligation,' 31 U.S.C. § 3729(a)(1)(G), which the FCA defines as 'an established duty, whether or not fixed, arising from' enumerated sources, including statutes and regulations, *id.* § 3729(b)(3)."  *Miller v. United States ex rel. Miller*, 110 F.4th 533, 545 (2d Cir. 2024).  "[T]he existence of a cognizable 'obligation' turns on whether a duty is 'established'—or 'whether there is *any* duty to pay.'"  *Id.* at 543 (quoting *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016)).  "[A] duty to pay is "established" only when it triggers an immediate and self-executing duty to pay.  In contrast, a duty to pay is not established—and there is no cognizable "obligation" under the reverse false claim provision—when the imposition of penalties depends on government discretion."  *Miller*, 110 F.4th at 545;

*see also United States ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 804 (2d Cir. 2025);

*United States v. Cooke Inc.*, 2025 WL 27662, at *7 (S.D.N.Y. Jan. 3, 2025).

The Terms and Conditions of the Uninsured Program to which Defendants subscribed

each time they submitted a Patient Roster contain the following relevant terms:

> The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.
>
> . . .
>
> The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the Recipient subsequently receives reimbursement for any items or services for *which the Recipient requested Payment from the FFCRA Relief Fund, the Recipient will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source.*
>
> . . .
>
> The Recipient agrees that all claims it submits will be full and complete (i.e., no interim bills or corrected claims). The Recipient acknowledges that all payments are final and there will be no adjustments.

First Terms & Conditions (emphasis added). In addition, HRSA's FAQs stated:

> The program identifies overpayments and has a process in place to collect the overpaid funds from future claims payments related to the HRSA COVID-19 Uninsured Program. Alternatively, providers who self-identify an overpayment can send a check.

Dkt. No. 693 at 40 (quoting HRSA's FAQs at Dkt. No. 185-5).

The Government argues that the language of the Terms and Conditions requiring that

"[i]f the Recipient subsequently receives reimbursement for any items or services for which the

Recipient requested Payment from the FFCRA Relief Fund, the Recipient *will* return to HHS that

portion of the Payment which duplicates payment or reimbursement from another source," First

Terms & Conditions (emphasis added), imposes an obligation which is immediate and

34

self-executing.  Dkt. No. 808 at 59.  It asserts that a provider in such a position has no discretion but to repay the FFCRA Relief Fund.  For their part, Defendants point to the language from the FAQs that "there will be no adjustments to payment once claims reimbursements are made" as well as the language that refers in the alternative to a set-off by the HRSA or the mailing of a check by a provider who self-identifies an overpayment.  Dkt. No. 693 at 39–40.  They highlight the apparently discretionary "can" in the FAQs.  *Id.* at 40.

Courts have held that the statutory requirement in the Affordable Care Act that a provider who receives an overpayment of Medicare or Medicaid Funds "shall . . . report and return the overpayment" imposes an immediate and self-executing obligation sufficient to support a reverse claim act under the FCA.  *See Omnicare*, 2021 WL 1063784, at *11; *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015); *United States v. Planned Parenthood Fed'n of Am.*, 2023 WL 11898264, at *8 (N.D. Tex. Oct. 23, 2023), *rev'd and remanded sub nom. United States ex rel. Doe v. Planned Parenthood Fed'n of Am., Inc.*, 2025 WL 618102 (5th Cir. Feb. 26, 2025), *reh'g en banc granted, opinion vacated sub nom. United States ex rel Doe v. Planned Parenthood Fed'n of Am., Inc.*, 142 F.4th 292 (5th Cir. 2025); *United States ex rel. Kuriyan v. Health Care Servs. Corp.*, 2020 WL 8079811, at *8 (D.N.M. Sept. 9, 2020).[6]

---

[6] The ACA sets a date certain for repayment of sixty days after the date on which the overpayment was identified or the date any corresponding cost report is due.  42 U.S.C. § 1320a-7k.  The obligation to pay turns on whether the obligation is "immediate and self-executing," *Miller*, 110 F.4th at 545, not whether a certain timeline for repayment is established.  That the ACA establishes a date for repayment following discovery of the overpayment does not make its obligation to repay any more immediate and self-executing than HRSA's mandate that providers "will return" payment following receipt of reimbursement from another source.  The time at which the obligation to pay begins is clear: once the provider receives reimbursement from another source for services that were paid for by the government.  First Terms & Conditions.  This is not a circumstance where the obligation to pay only manifests once the government identifies the overpayment.  *Cf. Miller*, 110 F.4th at 546 (statute stating that

An obligation under the FCA may be created by "an express or implied contractual . . . or similar relationship." 31 U.S.C. § 3729(b)(3). The Terms and Conditions constitute such a contractual relationship. Defendants agreed to be bound by them in consideration of HRSA's reimbursement of Defendants' claims. *See Gebser v. Lago Vista Indep, Sch. Dist.*, 524 U.S. 274, 286 (1998) ("an offer of federal funding on a promise by the recipient . . . amounts essentially to a contract between the Government and the recipient of funds."); *Silano v. Tirozzi*, 651 F. Supp. 1021, 1025 (D. Conn. 1987) ("federal grant programs are in the nature of a contract, whereby the federal government exchanges funds for the recipient's assurances that it will abide by certain conditions."). Moreover, the word "will," like the word "shall" "normally creates an obligation impervious to . . . discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). HRSA did not have to demand that Defendants return the overpayment; the obligation was both self-executing and immediate. *See Planned Parenthood Fed'n of Am.*, 2023 WL 11898264, at *8. The FAQs which do not enjoy the status of a regulation cannot alter that obligation. *See Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

That a mechanism existed for HRSA to recoup an overpayment from future claims where HRSA identified an overpayment does not diminish Defendants' obligation as a provider to return an overpayment when they have identified such overpayment. *Planned Parenthood Fed'n of Am.*, 2023 WL 11898264, at *9 (holding that the "mere fact that Texas and Louisiana have discretion not to pursue administrative recoupment of Medicaid funds does not mean Defendants had no obligation to return overpayments received after being terminated from Medicaid") (internal citations and quotations omitted); *United States ex rel. Kuriyan v. Health Care Servs.*

---

an entity "shall forfeit and pay" a civil penalty following a violation did not create a duty to pay because the penalty was only imposed following a discretionary enforcement decision).

36

*Corp.*, 2020 WL 8079811, at *8 (D.N.M. Sept. 9, 2020) ("The contractual language also does not support Defendants' argument that the State's option to recoup overpayments or apply them toward future payments indicates a contingent obligation. While the Contract does give the State discretion to either demand the return of overpayments or apply them to future payments, that discretion does not eliminate the obligation"). As the Amended Complaint itself alleges and Defendants acknowledge, HRSA's ability to identify overpayments was imperfect—even when the information it was receiving from providers was accurate. It was dependent on patients disclosing and the provider reporting the patient's Social Security Number. AC ¶ 134–35. If Optum did not have a Social Security Number, it and HRSA would not identify the existence of health care insurance. *Id.* Thus, Defendants' argument would create an untenable loophole. A provider could receive a double payment but because HRSA was never aware of it, the provider would be able to retain it. Neither logic nor the language of the Terms and Conditions support that result.

Defendants argue that the AC does not allege the heightened scienter necessary to sustain a reverse false claim case under the FCA. Reverse FCA claims require a higher level of intent than a direct false claim: the Government must establish that defendants acted "knowingly and improperly." 31 U.S.C. § 3729(a)(1)(G). Defendants assert that the Government has not cleared that hurdle because (1) the absence of knowledge to support the Government's action under the direct false claim provisions necessarily means that the Government "fails to sufficiently allege intent to support is 'reverse' FCA claim," Dkt. No. 693 at 41; and (2) certain paragraphs in the Amended Complaint reference Landau's statements that when Defendants were paid from insurance, they would repay HRSA, *id.* at 42. Defendants' arguments are unpersuasive.

37

The Court has rejected Defendants' arguments that the Amended Complaint does not sufficiently allege knowledge for purposes of the direct claims. Defendants' first argument which is based on that premise thus necessarily fails. Moreover, even if the Government had not alleged knowledge with respect to the direct claims, it would not follow that the Government insufficiently alleged that Defendants acted "knowingly and improperly" with respect to the reverse claim. The actus reus with respect to the two sections is different. The wrong in connection with the direct claim is the submission of a false claim. 31 U.S.C. § 3729(a)(1)(B). The wrong in connection with the reverse claim, by contrast, is the retention and concealment of funds to which the recipient has no entitlement. *Id.* § 3729(a)(1)(G). The fact that a provider may submit a claim attesting falsely but unknowingly that the patient has no other source to pay for a COVID-19 test thus does not mean that the provider also lacks knowledge that he has received a payment to which it is not entitled when, after receiving a payment from HRSA for a COVID-19 test, it also receives payment from private insurance with respect to that same test.

The AC alleges that Defendants both knew that they had received overpayments and knew of their obligation to repay HRSA upon receiving an overpayment. The Government alleges that near the end of the Uninsured Program, LabQ and Dart adopted a policy to simultaneously bill the Uninsured Program and commercial insurers for the same COVID-19 testing. Dkt. No. 493 ¶ 127. Defendants knew that, if they received payments from both insurers and from HRSA, they had an obligation to return the payment from HRSA. A LabQ employee confirmed Defendants knew that if LabQ and Dart were paid by insurance, they had to "reverse the HRSA claim back." *Id.* ¶ 128. Another LabQ executive with billing responsibilities acknowledged that Defendants knew of the obligation "to pay back HRSA" when commercial insurers had paid LabQ and Dart. *Id.* ¶ 129. However, starting on or after March 1, 2022 and

38

continuing through at least 2024, LabQ and Dart never returned any funds to HRSA even though they received payment from commercial insurers for the same tests. *Id.* ¶¶ 130–31. The Amended Complaint also alleges specific obligations that Defendants avoided. On June 20, 2024, Dart was paid $375 for a COVID-19 test provided to a patient on March 17, 2021. *Id.* ¶ 131. The Uninsured Program paid Dart $100 for that same test. *Id.* However, LabQ and Dart never returned the payment they received from the Uninsured Program. *Id.* Dart was also paid $375 by private insurance for a COVID-19 test provided to a patient on October 19, 2021 and for which Dart had already been paid by the Uninsured Program. *Id.* ¶ 132. However, LabQ and Dart never returned that payment. On August 2, 2021, Dart submitted a claim to the Uninsured Program for a January 31, 2021 COVID-19 test. *Id.* ¶ 73. Dart then submitted a claim to a private insurer for the same COVID-19 test three months later. *Id.* Dart received $625.30 from private insurance and never returned payment to the Uninsured Program. *Id.*; *see also id.* ¶¶ 71(a), 72 (additional instances where Defendants received reimbursement from other sources after submitting claims to the Uninsured Program and did not refund the program).

Finally, Defendants argue that the reverse FCA claim should be dismissed as redundant of the direct claims alleged in the first two claims for relief. Defendants are correct that a reverse FCA claim cannot simply be redundant of affirmative claims under sections (a)(1)(A) or (a)(1)(B). *See AECOM*, 19 F.4th at 119–20 (holding that reverse false claims that mirrored (a)(1)(A) and (a)(1)(B) claims are not actionable); *U.S. ex rel. Davern v. Hoovestol, Inc.*, 2015 WL 6872427 (W.D.N.Y. 2015) (declining to adopt interpretation of (a)(1)(G) that failure to repay money owed as a result of violation of (a)(1)(A) or (a)(1)(B) violates this section); *United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443 (S.D.N.Y. 2017) (dismissing reverse false claims allegations based on same acts supporting claims under (a)(1)(A) and (a)(1)(B)); *see also*

39

*U.S. ex rel. Askari v. PharMerica Corp.*, 2024 WL 1132191, at *4 (2d Cir. 2024); *U.S. ex rel. Gelbman v. City of N.Y.*, 2018 WL 4761575, at *8 (S.D.N.Y. 2018). It is not enough that the Defendant obtained monies from the Government under false pretenses and did not return it. That would make every direct claim also an indirect claim. The Government must show an independent obligation to repay, not merely that Defendants retained Government funds to which they were not entitled. *See U.S. ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 2021 WL 3620427, at *1 (S.D.N.Y. 2021) (stating that absent allegations of an independent obligation to pay the government, a reverse false claim is not sufficiently pleaded based only on allegations that a defendant retained Government funds to which they are not entitled).

However, the reverse claim here is not duplicative of the direct claims. The direct and reverse FCA claims are not based on overlapping conduct. *See AECOM*, 19 F.4th at 119 ("[A] reverse false claim cannot turn on the same conduct underlying a traditional false claim."). The direct claims are based on the Defendants' false attestations at the time they submitted claims to the Uninsured Program. That violation would be complete even if Defendants did not receive reimbursement from another source. It would be sufficient, for example, that it could have received reimbursement from another source. On the other hand, the reverse claim is based on conduct occurring after the submission of claims, and primarily after the close of the Uninsured Program: the receipt of payment from another payor following submission of the claim and the failure to fulfill their obligation to return the payment to HRSA. AC ¶¶ 126–132. That obligation arose not from the submission of a false claim, but rather from the Terms and Conditions, which required providers to return any payments reimbursed from another source. First Terms & Conditions. The falsity at the time of submission is irrelevant for the reverse FCA claim. As the Government explained at oral argument, "[i]t could be for a particular claim . . .

discovery will reveal that they made good faith efforts; and therefore, there's not a false claim on the attestation.  But in 2024 when they get a payment from that private insurer, they have an obligation to return" the payment.  Mar. 9 Tr. at 51:1–7.  The Government thus could establish its reverse claim even if it did not establish its direct claims and could establish its direct claims even if it did not establish its reverse claims.  *Cf. Omnicare, Inc.*, 2021 WL 1063784, at \*12 ("If discovery demonstrates that Omnicare failed to *knowingly submit* false claims to the government for reimbursement—as Omnicare contends was the case—then it may not be liable for the two conventional FCA counts.  However, if discovery also reveals that Omnicare improperly kept the reimbursements after the payments were determined to have been made in error, then the government's reverse false claim takes on independent significance, as Omnicare could still be liable based only on that theory of liability").

Accordingly, the motion to dismiss the reverse claim in claim three is denied.

### III.    Unjust Enrichment & Payment by Mistake

Counts four and five of the AC allege claims for payment by mistake and for unjust enrichment under federal common law.  Defendants argue that the Government fails to allege that equity demands repayment to the Government when Defendants provided an essential service during a global pandemic.  Dkt. No. 693 at 43.  Defendants argue that New York common law should apply to the Government's claims, *id.* at 42, whereas the Government relies on federal common law, Dkt. No. 808 at 72.  Federal common law applies to these claims.

"[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979). The United States' rights under the FCA clearly arise under a nationwide federal program. Moreover, it is long established that the "Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303

U.S. 414, 415 (1938). "No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." *Id*. (quoting *United States v. Bank of Metropolis*, 40 U.S. 377, 378 (1841)). "[T]he government's common law right to recover funds wrongfully paid is well established." *United States v. General Dynamics Corp.*, 19 F.3d 770, 773 (2d Cir. 1994). Courts have consistently held that federal common law claims are available to the government and can coexist with FCA claims. *See, e.g., id.*; *Omnicare*, 2021 WL 1063784, at *13 (denying motion to dismiss common law unjust enrichment and payment by mistake claims); *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497, 539 (S.D.N.Y. 2014) (denying motion to dismiss common law unjust enrichment claim and FCA claims); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1086 (N.D. Cal. 2020) ("Because the court has held that payments predicated on false diagnosis codes are overpayments, the court denies the motion to dismiss the common-law claims").

The Court has found sufficient allegations that the Government reimbursed claims to Defendants in reliance on false attestations that the patients were uninsured or that no other payor would reimburse the claim; the Court has further found that Defendants retained incorrect payments and failed to reimburse the Government. These allegations state a claim for unjust enrichment and payment by mistake. *See Kester*, 23 F. Supp. 3d at 269 (denying motion to dismiss state law claims for unjust enrichment and payment by mistake under Rule 9(b) where "entire Complaint is premised on allegations that the Government reimbursed pharmacies for false claims"). That Defendants, through their highly profitable business, supplied COVID-19 testing during a pandemic does not alter the equities.

The motion to dismiss the Government's common law claims is denied.

IV.    **Liability of CMT**

Defendants finally argue that the AC should be dismissed as to CMT. Dkt. No. 693 at 47. Defendants argue that the AC "fails to sufficiently differentiate between CMT and the other defendants," "fails to allege that a single claim was presented by CMT," and "fails to allege with specificity that CMT knowingly made, used, or caused others to make false records and statements material to the payment of claims to the UIP." *Id.* The Government contends that the AC contains specific allegations that CMT knowingly caused LabQ and Dart to submit false claims to the Uninsured Program by its failure to meaningfully train technicians on the collection of insurance. Dkt. No. 808 at 68–69. The Government alternatively argues that the AC sufficiently pleads that the Corporate Defendants are alter egos of Landau and the Government may bring FCA claims against a defendant under an alter ego theory. Dkt. No. 808 at 70–71 (citing *United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 24–26 (D.D.C. 2016)).

On reply, Defendants maintain their argument that the AC fails to plead an FCA claim as to any defendant, which is dispositive as to CMT, but concede that alter-ego and veil-piercing theories "are inherently fact-intensive." Dkt. No. 840 at 32. Defendants thus state that "[i]f any claim were otherwise to survive, . . . the role and corporate status of CMT would be matters for later factual development." *Id.* The Court agrees. "The determination of alter-ego liability is a fact-intensive inquiry," *Milestone Shipping, S.A. v. Estech Trading LLC*, 764 F. Supp. 2d 632, 636 (S.D.N.Y. 2011), and "is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss," *Anhui Aido Garment Co., Ltd. v. Stern*, 2025 WL 1663860, at *3 (S.D.N.Y. June 12, 2025). The Government alleges facts that make its alter-ego theory plausible. *See Backuswalcott v. Common Ground Community HDFC, Inc.*, 104 F. Supp. 2d 363, 369 (S.D.N.Y. July 24, 2000) ("To determine whether or not a corporation is the alter ego of another, a variety of factors are examined including the sharing of a common office, staff, and ownership; the

43

intermingling of funds; the treatment of the corporations as one, not separate, profit centers; the absence of formalities and paraphernalia of corporate existence; and any inadequate capitalization."). The Government alleges that Landau is the CEO of Dart, LabQ, and CMT, the majority owner of CMT, and owner of 30% of each LabQ and Dart. AC ¶ 139. The Government further alleges that Dart did not have its own employees but operated with LabQ employees. *Id.* Similarly, the Government alleges that Landau described employees at mobile testing sites as "LabQ employees under Community [Mobile Testing]" and operated CMT as a division of LabQ, not as a separate entity. *Id.* Employees of all three Corporate Defendants, including senior executives, reported to Landau, *id.* ¶¶ 139–40, and Landau oversaw all aspects of their operations, *id.* ¶ 140. The Government further alleges that the Corporate Defendants intermingled funds and sent moneys back and forth between them as though they were one company, including allegations that between 2021 and 2024 CMT sent more than $198,000 to a bank account of LabQ and LabQ sent more than $1 million from that account to CMT. *Id.* ¶ 141. The Corporate Defendants used the same address on their respective bank accounts and Landau had signature authority over each of their financial accounts. *Id.* ¶¶ 142–43. These allegations are sufficient for the Government's theory of alter-ego liability to go forward.

The Court has determined that the Government has stated a claim under the FCA and plausibly alleged an alter-ego theory of liability. Defendants' motion to dismiss the claims as to CMT is denied.

**CONCLUSION**

The motions to dismiss are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 692 and 694.


SO ORDERED.


Dated: March 20, 2026
      New York, New York

                               LEWIS J. LIMAN
                        United States District Judge